HENDERSON'S ADMINISTRATOR, Respondent, vs. HENDERSON, Appellant.

1. A judgment for the plaintiff will not be reversed for an insufficient finding of the facts, if the matters set up in the answer constitute no defence.
2. In a suit by an administrator upon a note of his intestate, it is no defence that the county court had allowed a former administrator, upon settlement, credit for the amount of the note.
3. An allegation in the answer that the intestate, before his death, "gave the note to the defendant, and made arrangements to have it delivered up to him, which was neglected to be done," is no defence; these facts constituting neither a *donatio causa mortis*, nor a valid gift or equitable release.

*Appeal from Platte Circuit Court.*

Action on a note by John Henderson's administrator *de bonis non* against Joseph Henderson. The answer set up these de-

fences : 1st, That John Henderson, before his death, " gave the note to the defendant, and made arrangements to have it delivered up to him, which was neglected to be done ;" 2d, That the county court of Platte county, having probate jurisdiction, " released the executor of the estate of John Henderson, and by its judgment determined that the defendant was not liable for the payment of the note ;" and, 3d, The statute of limitations. But this last defence was abandoned.

The Circuit Court, upon a trial without a jury, found the facts, but the finding was silent as to the matters relied upon in the answer. Judgment was rendered for the plaintiff, and the defendant appealed.

*Hayden, Morrow & Davis*, for appellant.

*H. M. Vories*, for respondent.

LEONARD, Judge, delivered the opinion of the court.

1. There is no error in this record except in the finding of the facts, which is clearly insufficient. Indeed, there is no finding as to the matters set up in the answer in bar of the plaintiff's recovery upon the note, which are the only facts put in issue by the pleadings, and, therefore, if these matters constitute a good defence, the judgment must be reversed ; but if they would not avail the defendant, assuming them to be true, the defective finding cannot prejudice him, and is no ground for a reversal. We proceed to examine the several defences relied upon, in connection with the defendant's proof.

2. According to his own showing, he is not protected by the statute of limitations, and it is very clear that the order of the county court, referred to in the answer allowing the former administrator credit in his administration account for the amount of the note and interest, is no adjudication of the rights of the respective parties to it, so as to conclude either debtor or creditor. It was made in an *ex parte* proceeding by the former administrator for the purpose of obtaining this credit against the corresponding charge in his inventory, and, in a proceeding between the payor and payee, instituted for the purpose of

determining their rights in reference to the note, and what was then adjudged, most clearly does not conclude the present parties.

3. The real question, however, intended to be litigated in this record, we suppose, is, whether what passed on the part of the father amounts in equity to a valid gift of the note, or, which is the same thing, to an equitable release of the debt.

The transaction was not pleaded as a *donatio causa mortis*, and the defendant's own proof shows that it was not a gift of that character. It was intended, if a gift at all, as a present, absolute gift, not as a testamentary disposition—a conditional transfer, to take effect when, and in case the donee died, which distinguishes the latter from the former species of gift, and is essential to a death-bed donation. Besides, there was no delivery, and without delivery there can be no such gift; and we do not think there is any ground for the opinion that it amounted, in equity, to an extinguishment of the debt, either as a valid, voluntary assignment of it, or as an equitable release. We refer now, for a moment, to the progress and present state of the English law, upon the subject of disposing of *choses in action*, contingent rights and possibilities. By the common law, these interests could not be granted to a stranger; but, as Lord Cowper remarks, in *Thomas* v. *Freeman*, (2 Vern. Rep. 563,) "the law was not so unreasonable as not to allow them to be released to the debtor or the party in possession." This rule, however, never found favor in the court of chancery, and a device was resorted to there, in order to get rid of it. The assignment being void at law, as a present transfer, was entertained in equity as an agreement to transfer, which the court would enforce, (*Wright* v. *Wright*, 1 Ves., sen., 411,) and the maxim of the court, "what ought to be done is to be considered as done," being applied to the transaction, the beneficial ownership of the debt was, in contemplation of a court of equity, vested by the assignment in the assignee, and both debtor and creditor were, to some extent, converted into trustees for him, the debtor being bound, after notice, to pay to him

alone, and the creditor to allow him the use of his name in the collection of the debt. Equity, however, would not compel the execution of an agreement, unless it was founded upon a valuable consideration, and so voluntary assignments were not aided in chancery, but a different expedient has been resorted to in reference to them. Although equity will not lend its aid to enforce a voluntary agreement, yet, when there is a trust actually created—a constituted trust—the court will enforce its execution against the trustee, in favor of a *cestui que trust*, who is a mere volunteer. In *Ellison* v. *Ellison*, (6 Ves. Rep. 661,) Lord Eldon thus states the principle: "I take the distinction to be, that, if you want the assistance of the court to constitute you *cestui que trust*, and the instrument is voluntary, you shall not have that assistance for the purpose of constituting you *cestui que trust*, as upon a covenant to transfer stock, &c., if it rests in covenant and is purely voluntary, this court will not execute that voluntary covenant; but, if the party has completely transferred stock, though it is voluntary, yet, the legal conveyance being effectually made, the equitable interest will be enforced by this court." The early cases, in which this principle is recognized and acted upon, were all cases where the legal interest in the property was transferred in pursuance of an antecedent agreement, or direction, declaring the trusts, or as part of the transaction creating the trust, (Vice Chan. Wigram in *Meek* v. *Kettlewell*, 23 Eng. Chan. Rep. 470,) and, of course, they are not applicable where the legal interest was not and could not be transferred; but in *ex parte* Pye and *ex parte* Dubost, (18 Ves. Rep. 149,) Lord Eldon went a step further, and said, "it is clear that this court will not assist a volunteer; yet, if the *act is completed, though voluntary*, the court will act upon it. It has been decided that, upon an agreement to transfer stock, this court will not interpose; but, if the party has declared himself to be the trustee of that stock, it becomes the property of the *cestui que trust*, without more, and the court will act upon it;" and, in that case, he accordingly held that the acts of the owner of the stock, which were

relied upon as a gift of it, were equivalent to a formal declaration of trust, and, although purely voluntary, passed the beneficial ownership, whether there was a change of the legal ownership or not. In the subsequent cases of *Wheatly* v. *Parr*, (1 Keen, 551,) *Collinson* v. *Patrick*, (2 Keen, 123,) and *McFaddin* v. *Jenkins*, (1 Hare, 458,) it is settled that a formal declaration of trust by the beneficial owner, or conduct on his part, equivalent to such a declaration, is sufficient in equity to effect a change of property, without any change of the legal title, or any consideration whatever for the transfer; but the distinction is still kept up between such transactions and a formal assignment. Two cases decided by Vice Chancellor Wigram, in 1842, illustrate this distinction, and state the grounds of it. In *Meek* v. *Kettlewell*, (1 Hare, 466,) he decided that a voluntary assignment, by deed, made by the *cestui que trust*, of a contingent reversionary interest in a fund standing in the name of trustees, was not valid in equity as a transfer of the fund; and, in *McFaddin* v. *Jenkins*, before referred to, where the donor directed his debtor, through a third person, to hold the money he owed him in trust for the plaintiff, and the party accepted the trust, and paid a small part of the debt to the plaintiff, and the creditor himself never afterwards demanded the debt, the same judge held that these acts constituted the creditor a trustee for the plaintiff in respect to the debt. In reference to the difficulty of reconciling the cases upon this subject, he remarked, in the last case: " Perhaps they are to be reconciled and explained upon the principle that a declaration of trust purports to be and is, in form and substance, a complete transaction, and the court need not look beyond the declaration of trust itself, or inquire into its origin, in order that it may be in a position to uphold and enforce it; whereas, an agreement or attempt to assign is, in form and nature, incomplete, and the origin of the transaction must be inquired into by the court, and where there is no consideration, the court, upon its general principles, cannot complete what it finds incomplete."

The idea, however, that an assignment operates by way of agreement, and therefore cannot have effect as a perfect gift, has, it would seem, been at length entirely overturned in England, by the case of *Vogle against Hughes*; decided upon appeal in the court of chancery, as late as January, 1854, where it was held that a voluntary assignment by deed, of a reversionary interest in stock standing in the name of trustees, with notice to them, was a valid disposition in equity of the fund on the part of the *cestui que trust*. (23 Eng. Law and Eq. Rep. 271.) The judge who delivered the opinion of the court, speaking in reference to the assignment, says : " It is not an agreement, it is an absolute assignment by deed, purporting to transfer the estate or interest of the assignor to the assignee. As between them, the transaction is complete. Notice was given to the trustees, and that completed it as to third parties—established the right of the assignee on a question of priority, and protected her against any fraudulent receipt by the assignor." " The progress of law, as a science, keeping pace, although not uniformly, with the advancement of civilization and wealth, has sanctioned modes of alienation and enjoyment of property, both real and personal, which were prohibited by the common law." " By force of the deed of assignment, the equitable right was transferred by Mrs. Kurner to Miss Noble—the transaction was completed by Mrs. Kurner's execution of the deed, and no valuable consideration was necessary to support the assignment."

This case, of course, is not directly applicable to the assignment of a legal *chose in action*, but there is no distinction in reason between them, and none, it is believed, has ever been taken in the previous cases. And it may, perhaps, now be considered the doctrine of English equity, that, where a trust is constituted, the court will act upon it in favor of a volunteer ; that a person may constitute himself a trustee for another, without any change of the legal ownership, and that any act done by the beneficial owner of the fund, amounting, unequivocally, to a declaration that an interest in his property

should thereby become vested in another, whether the act relied upon be an assignment, or a formal declaration of trust, or some equivalent act—notice of which is communicated to the person in whom the legal interest is, and to the *cestui que trust*—is a valid creation of a trust in favor of a volunteer.

We return now to the facts of the present case, for the purpose of determining whether the matters relied upon constitute a perfect gift of the note, or an equitable release of the debtor. The facts stated in the answer are, that the father, some short time before his death, gave his son the note, and made arrangements to have it delivered to him, which was never done ; and the proof was, that the father, at the time the note was given, loaned his son a hundred dollars, saying he gave it to him, but took the note, so that, if he should ever need the money, he might have it paid back to him ; and that afterwards, and a short time before his death, he told a neighbor he never intended his son should pay the note, and requested him to tell his son to come to his house and have the matter arranged—(to come and get the note, as witness understood it.)

Here, it is to be observed, is no instrument of assignment, nor any formal declaration of trust, nor is there any thing amounting to an unequivocal declaration, even in words only, that the debt should thereby become the property of the son, much less, in words, accompanied by corroborative acts done, or acts omitted, as was the case in *McFaddin* v. *Jenkins*, before cited. We think it very clear that every thing here done and said fails to come up to a completed transaction—a perfect gift—but, at the utmost, amounts only to an intended bounty, resting in promise, not yet completed, but to be afterwards executed by a surrender of the note, when the son should visit the father to receive it. What was said by the father, when the note was given, of course could not be received against the effect of the written instrument, but was given in evidence, we suppose, in corroboration of the alleged subsequent gift.

In *re* Campbell's estate, ( 7 Barr, 100,) a childless old man, intending to die intestate, calls for his bonds and notes, in or-

der to distribute them among the objects of his bounty, and when they were transferred, he asks whether they are all, and is told by his wife they are all, except those now in controversy. She asks what is to be done with them, and he told her to burn them. This was not done, and it was held that the notes were not discharged, but constituted a part of the intestate's estate, the transaction not amounting to a release or a valid gift of them. As to the equitable release, although there are acts and declarations on the part of the creditor, that will be considered in equity equivalent to a release of the debt, yet, a mere acquittance, by words in the present tense, unaccompanied by acts, is not sufficient to induce a court of equity to deprive a creditor or his representatives of the right of enforcing their legal remedies against the debtor.

In *Richard* v. *Syms*, (2 Eq. Cas. Abr. 617,) the mortgagee said to the mortgagor : "Take back your writings, I freely forgive you the debt." The mortgagor accordingly took them, and it was alleged the mortgagee, at the same time, made a verbal statement to the mother, to the effect that he had intended to forgive the debt. Lord Hardwicke considered that, if the matter were proved, the debt would be extinguished.

In *Gilbert* v. *Wetherell*, (2 Sim. & Stu. 258,) the father, upon his death-bed, desired his daughter to bring him his pocket-book, which she did, and he took out of it the son's promissory note for £10,000, and put it into the hands of the daughter and desired her to burn it, which she immediately did, in his presence. When it was burnt, he said, "now Thomas owes me £11,000," (there being other demands against the son,) and this was held to amount in equity to a release of the debt.

But in *Tuffnell* v. *Constable*, (8 Sim. Rep. 69,) where the testator had signed a memorandum acquitting the plaintiff of £700 out of £1700, due to him on the plaintiff's bond, stating, verbally, that in consideration of such release, he had revoked a legacy of £700, given by him to the plaintiff, by his will, and the plaintiff, upon being sued, filed a bill for relief as to

the £700, — the chancellor refused it, saying that he was a volunteer, and had no right to come into equity.

In the present case, there were no words of present acquittance, much less, such words accompanied by acts, such as a surrender or destruction of the note, to relieve the transaction from any uncertainty as to the intention of the party to forgive the debt and authorize the court to declare that the transaction amounted to a release. The whole transaction looked to the future, and was not a present release of the debt.

The result is, under every view of the case, that the judgment must be affirmed, and it is so ordered, with the concurrence of the other judges.