# WHEELING.

## MARLING v. MARLING.

### July 17, 1876.

A court of equity should furnish its aid, in making effective, a gift by a father to a child, of land, where the gift is evidenced by an un-sealed instrument, executed by the father, and formally delivered to the child.

1876.<br>June Term.

Appeal from, and *supersedeas* to, a decree of the circuit court of Ohio county, rendered on the twenty-second day of August, 1874, in a suit therein pending, wherein Mary Marling and Elizabeth Marling were complainants, and Elijah Marling, respondent. The appeal was taken by the respondent. The case is fully stated in the opinion of the Court.

The Hon. Thayer Melvin, judge of said court, presided at the hearing below.

*William P. Hubbard* for the appellant.

*Joseph H. Pendleton* for the appellees.

GREEN, JUDGE:

Mary Marling and Elizabeth Marling, brought a suit, in chancery, in the circuit court of Ohio county, in 1873, against their father, Elijah Marling, to compel him to convey to them a certain farm, in that county. It appears that in 1845, Elijah Marling bought this farm of Hardesty, and it was conveyed to him; that, shortly there-

after, he put his said daughters in possession thereof and they have ever since lived upon this farm. On May 3, 1863, in consideration, only, of his love and affection to them, he executed and delivered to them this paper :

"I *sine* all my interest and claim unto Mary Marling and Elizabeth Marling, the farm they now live on, *coled* the *Harsty* farm, as witness my hand and *sel*.

ELIJAH MARLING."

The circuit court of Ohio county ordered Elijah Marling to execute, with special warranty of title, a deed of said farm to them. From this decree, Elijah Marling has appealed to this Court.

The question presented to this Court, for the first time is, whether a court of equity should furnish its aid in making effective a gift, of land, by a father to his child where the gift is evidenced by an unsealed instrument, executed by the father, and, formally, delivered to the child.

Where there is no consideration of any kind, the courts have decided that where a trust is, actually, created, and the relation of trustee and *cestui que trust* established, a court of equity will, in favor of a volunteer, enforce the execution of the trust; although it will not create a trust, or establish the relation of trustee and *cestui que trust*, by giving effect to an imperfect conveyance in favor of a volunteer, *Ellison v. Ellison*, 6 Ves. Jr. 656, 1 Ld. Cas. in Eq. 199. It has also been *held* that a declaration, by a party, that property shall be held, in trust, for the objects of his bounty, though unaccompanied by any deed or other act divesting himself of the legal estate, is an executive trust, and will be enforced ; and if the property is personal, such declaration may be by parol, without any writing. *Pye, ex parte & Dubost*, 18 Ves. Jr. 140; *McFadden v. Jenkyns*, 1 Hare 458 ; S. C. 1 Ph. 153. *A court of equity, in such cases, not being governed by the analogy of uses, for a use could not arise by parol agreement, without a deed, except where the consideration is valuable—Jones v. Morley*, 12 Mod. 161. When

1876.
June Term.

Marling
v.
Marling.

the consideration is meritorious, such as the obligation of a parent to provide for his child, will a court of equity establish the relation of trustee and *cestui que trust*, by giving effect to an imperfect conveyance, or by enforcing the specific performance of an executory agreement? There are expressions, in the opinion of Lord Eldon in the case of *Ellison v. Ellison*, and of Lord Thurlow, in the case of *Colman v. Sorrell*, 1 Ves. Jr. 50, which show that they supposed a court of equity would, in such case, afford aid, if the consideration was meritorious; though this question was not before the court in these cases. And in the case of *Ellis v. Nimmo*, L. and G. *temp.* Sugden 333, 10 Cond. Eng. Ch. 534, Lord Sugden decided this question in the affirmative, after the most mature consideration. In that case the father, John Nimmo, agreed with his son-in-law, Brabazon Ellis, that he would settle upon his daughter Mrs. Ellis, fifty pounds a year, during her life, to be raised out of a certain estate owned by him. The agreement was reduced to writing and signed by John Nimmo, but not sealed. The Lord Chancellor says : "In this case the question is, whether the consideration is sufficient to support a post nuptial agreement in writing, entered into by a father in favor of his child. I should say the agreement ought to be specifically executed, if we look back we shall find what was the consideration necessary, to raise a use before and after the statute. In *Gilbert* on Uses 92, it is laid down, "if a man, in consideration of natural love and affection, covenants to stand seized to the use of his son or brother, nephew or cousin, this is a good use." Upon a covenant to stand seized, for the benefit of a wife or child, equity held such a consideration sufficient to bind the estate. That was a use before the statute ; that use the statute executed and turned into a possession ; still it rested upon the original equity. A covenant to stand seized was, merely, an agreement founded on, a good or meritorious consideration, and the statute executed the agreement.

11

But though covenants to stand seized, before the statute, were mere contracts, which equity, specifically, enforced; yet as the statute operated upon them, they were, at once, distinguished from mere agreements or contracts, resting *in fieri,* to settle an estate, just as bargains and sales, which, before the statute, were contracts to sell, became actual conveyances, by force of the statute, and were not confounded, after the statute, with simple contracts to sell; and which, from their nature, could not be deemed executed. How far the consideration, which, before the statute, was sufficient to support a covenant to stand seized, or a bargain and sale, could sustain a contract, to sell or settle an estate, since the statute, so as to enable equity to, specifically, enforce it, has been the subject of much judicial investigation. In *Fothergill v. Fothergill,* 2 Free. Ch. 250, it was *held* "that whenever a conveyance was made upon a good consideration, if there be any defect in the execution of it, that this court hath always supplied the defect; and though provisions, for a wife and children, after marriage, are not valuable considerations; yet they are good considerations, and were always helped in this court." In *Chapman v. Gibson,* 3 Bro. C. C. 228, a surrender was supplied, in favor of the wife, against the heir-at-law. Lord Alvanley saying, that he thought the execution of a power and a surrender of a copyhold go hand in hand precisely on the same ground. Now equity always assists a defective execution of a power, voluntarily executed, in favor of a wife as depending upon the natural obligation. But the court did not treat every consideration, which would have raised a use before the statute, as sufficient to justify its interference after the statute.

In *Watts v. Bullas,* 1 P. Wms. 60, (a case found fault with by Lord Hardwick in *Goring v. Nash,* 3 Atk. 189) a voluntary conveyance to a brother of the half blood, defective, in law, was made good in equity. The Lord Keeper's opinion was that as a *cestui que use,* before the statute, in such case, could have compelled an execution

of the use, in a court of equity, so would this imperfect conveyance raise a trust, in respect of the consideration of blood, and, consequently, ought to be made good in equity. The principle was correct, Lord Hardwick thought, but it was carrying it too far; for it would carry it to the remotest blood, that could raise a use in law, and which this court does not regard;" the Chancellor then reviews the cases of *Stephens v. Trueman*, 1 Ves. Sen. 73; *Goring v. Nash, supra, Osgood v. Strode*, 2 P. Wms. 249; *Colman v. Sorrel*, 3 Bro. C. C. 127 and 1 Ves. Jr. 50, and concludes thus: "In my opinion, the contract should be specifically executed, though I have great hesitation, in laying down this principle, and took time to consider it further." And two months afterwards, having maturely considered the subject, he says, "The question is, whether an agreement, for a meritorious consideration, resting *in fieri*, is such a contract as a court of equity will enforce.

"I stated on a former occasion that, before the statute, the courts compelled the specific performance of agreements, for valuable or meritorious considerations; and they viewed meritorious considerations in a very favorable light, holding them to include, not merely a wife or a child, but some collaterals, as a brother, nephew or cousin. A covenant to stand seized was a mere contract or agreement by a person to settle or hold his estate for the benefit of his family; and a meritorious consideration alone, without a valuable consideration, was sufficient to support such a contract. Afterwards came the statute for transferring uses into possessions. That statute made no other change than that of transferring or turning the use into a possession, which carries the legal right. Now in that view, the statute operated on the original consideration. In the case of bargains and sales, the use is still raised, by reason of the old doctrines; money or rent was sufficient to raise such a use upon a bargain and sale, which was originally a contract for sale, in a lease executory. Equity, before the stat-

1876.
June Term.

Marling
v.
Marling.

ute, raised the use, and after the statute, the use was operated upon by the statute. Covenants to stand seized were, quaintly, called conveyances, not operating by transmutation of possession. The further interference of equity would seem to have been excluded, but the general voice being in favor of uses, modes were invented for their re-introduction, in spite of the statute, and the statute itself, simply, operated to introduce new modes of conveyance, which would carry the legal estate. But this did not interfere, with the ancient equities, or the operation of the statute upon them : Suppose a bargain and sale, in consideration of five shillings, the statute would operate on that, and vest the legal estate, because there was a valuable consideration, and equity did not enquire into the amount of it. It became a form of conveyance. Now if, since the statute, it could be shown, that five shillings, which is a mere nominal consideration, was the only one, the court would set aside the conveyance, and look into the real merits of the original transaction being still open to investigation in this court, so that the conveyance, as such, still operates, by force of the original equity, that the consideration was sufficient, and yet a court of equity may set aside the conveyance, because it deems the consideration insufficient.

As regards covenants to stand seized, they remain, as before the statute, mere agreements to hold the estate for the benefit of the settlor's family. In *Watts v. Bullas*, 1 P. Wms. 10., the Lord Keeper who had then, recently, come on of a court of law, seemed inclined to impart the opinions then formed into equity, and he enforced a conveyance in favor of a brother, of the half blood. Lord Hardwick found fault with that, and it, certainly was carried too far, but the principle is correct, and there is no reason why equity should not now execute an agreement in the same manner, as, before the statute, it would have compelled an execution of the use, provided it be, within the proper limits : for instance, a provision for a wife or child, defective execution of powers are

said to be analogous to this case. Such defective executions and defective surrenders, of copyholds, strictly, depend upon the same rules. Now in these cases, the court executes the intention of the settlor, either against his representatives or the person taking the estate, in default of a valid execution of the power or surrender of the copyholds, when there is a good consideration. If there be such a consideration, the party taking the estate is not permitted to rely upon the defect; but the court will effectuate the intention of the settlor, and, speaking generally, this equity is enforced, not against the settlor himself, but in his favor, that is in the execution of his intention, and at the expense of a third party. That rule is now settled. But this case does not rest, exactly, on the same grounds as defective executions of powers, as in cases like the present, there is a contract; whereas the former do not arise out of a contract, but depend upon an intention to settle. In all such cases, however, the court requires a sufficient consideration, and I find a provision for a wife or child is held a meritorious consideration, proper to call into action the power of a court of equity, in aid of a defective execution or surrender. Now in my opinion it makes no difference, whether that power is required to aid a defective surrender, or to enforce an agreement *in fieri*; in each case, a sufficient consideration is necessary to enable the court to act; in the one case, it has been established what is a sufficient consideration, and that must apply, equally, to the other case.

"I have before me a contract, which I am bound to enforce, if there is a sufficient consideration. The consideration is such, as would enable the court to remedy even a defective settlement, where there is no contract. I think it, *a fortiori*, sufficient to sustain an actual contract, and I shall, therefore, decree a specific performance of the agreement."

The authority of this case was, however, weakened, by

the case of *Dillon v. Coppin*, 4 Myl. and Cr. 647, 18 Eng. Ch. R. 646. It was the case of an imperfect transfer; and the circumstances did not indicate an absolute intention of the parent to make it. The father retained the deed, in his possession, during his life, and had endorsed, on an envelope on the deed, that it was to be given to his daughter. The case was also between children of the same testator. It was also further weakened by the decision of *Jeffereys v. Jeffereys*, 1 Cr. and Ph. 138, 18 Eng. Ch. R. 137. The case was that of a child, to whose use the father had covenanted to surrender a copyhold, against the wife, to whom he had devised it; and who after his death, had been admitted. The two claims were, equally, meritorious—the children and the widow. The court refused its aid. And in the case of *Moore. v. Crofton*, 3 Jo. and Lat. 442, Sir Edward Sugden found himself obliged to yield to the current of authority, and to admit, *Ellis v. Nimmo*, to be overruled. He, however, declared that he still thought it decided, upon sound principles of equity. But the tendency of American authorities is to sustain the principles laid down by Lord Sugden in this case.

. In the case of *Thompson v. Thompson*, 3 Miss., the court of appeals cancelled an instrument of writing, whereby a father gave to his children thirteen negroes, after his death, the negroes to remain in his possession. The instrument of writing was not under seal, and, though delivered, it was alleged, though not proven, that it was an imperfect paper to be held, during the pleasure of the donor. The court say that their decision would have been the same, had the instrument been a deed. In *Taylor v. Taylor*, 2 Humph. 597, the court set aside, as a deed, a sealed instrument, by which he gave to his son certain slaves. It was witnessed and deposited in his trunk, with the declaration, made to several parties, that it should take effect at his death, but not before. The court declared that the instrument was inoperative, as a deed, but retained the case, with leave to the son, if

he could, to have the paper propounded, in the proper court, as a will.

In *Martin's Admr. v. Rumsey*, 5 Humph. 349, a deed of gift was found amongst the papers of a dead man, executed by him to his daughter, and witnessed: there was no evidence, from his conduct or declarations, that he considered the act complete when he acknowledged the deed; the court, therefore, held the property to belong to the administrator of the father. But in the case of *Graham & Co. v. Lambert*, 5 Humph. 595, a father executed to his daughter an absolute conveyance of all his negroes and other personal property, retaining a life estate to himself; at the same time, he took from her a bond, to her brothers and sisters, agreeing to divide this property, equally, among them, herself included, at her father's death. He, subsequently, surrendered this bond to her, she retaining the deed: *Held* that the bond and deed, together, constituted a conveyance and settlement of his negroes and other property, on all his children, which is supported by the consideration of love and affection; and the bond could not be surrendered without the consent of those for whose use it was made.

*In re Campbell's estate*, 7 Barr 101, an uncle directed a promissory note to him of a nephew, to be given up or destroyed, but it was never done: *held*, that the nephew was not, thereby, released from the payment of the debt, to the uncle's administrator And in *Henderson's Admr. v. Henderson*, 21 Mo. 379, the same was *held*, when a father had directed his son's note to be surrendered, but which had not been done. In *Kennedy's Exor. v. Ware*, 1 Barr 445, Chief Justice Gibon, in delivering the opinion of the court, *held* that an equitable assignment of a *chose in action*, in consideration of natural love and affection, is void; but the same Judge in *Dennison v. Goehring*, 7 Barr. 179, says, "But even if we were to take the deed to be not a conveyance of the legal estate in trust, but an executory agreement to create a trust, it is far from clear, that the result would be different. Natural affection,

though not a valuable, is a meritorious consideration; on the foot of which, an agreement by a father to secure a provision for his child has been enforced in equity, by reason of the obligation of parents to provide for their offspring. Thus a covenant with a son to renew a lease was enforced, in *Husband v. Pollard*, cited 2 P. Wms. 467; and in *Goring v. Nash*, 3 Atk. 189, a father's covenant to settle an estate on his son was specifically executed. In such a case, a legitimate child is not held to be a volunteer, though it was *held* in *Fursaker v. Robinson*, Prec. in Ch. 475. that a bastard is so. In corroboration of the principle, may be mentioned those cases in which equity has supplied the surrender of a copyhold, and the defective execution of a power, in favor of an illegitimate child."

In *Pennington's Admr. v. Gitting's Exor.*, 2 Gill. and Johns. 208, it was *held* that a certificate of bank stock, endorsed by a father and delivered to a son, would not sustain a bill in equity for the transfer of the stock. The court says, "The consideration of natural love and affection is sufficient in a deed; but a mere executory contract, that requires a consideration, cannot be supported on the consideration of blood or natural love and affection; there must be something more; a valuable consideration, or it is not good and cannot be enforced at law, but may be broken at the will of the party. And being void, at law, chancery cannot sustain and enforce it." But in the case of *Haines v. Haines*, 4 Md. Chy. Decissons 133, Johnson Chancellor seemed to consider, that a court of equity should deal favorably with an agreement to convey land by a parent with a child, and it would be supported by a slight consideration, and, on an appeal from his decision 6 Md. 435, the court of appeals of Maryland *held* that, where a father executed a written contract, under seal, whereby he agreed, in consideration of $5 received, to convey to his daughter a tract of one hundred and seventy acres of land, of which he had put her in possession, a court of equity would, on her appli-

cation, based on this paper alone, decree a specific performance.

In North Carolina, it is held that a deed, from a husband to a wife for slaves, cannot have the effect of vesting the title in her, yet it amounts to a declaration of trust in her favor, *Huntly v. Huntly*, 8 Ired. Eq. 250.; *Gainer v. Gainer*, Busb. Eq. 1 The court, in the last case, quotes from Adam's Equity, approvingly, "Although a promise made without a valuable consideration is void, yet if an intended gift, on meritorious consideration, be imperfectly executed, and if the intention remains unaltered, at the death of the donor there is an equity to enforce it in favor of his intention against persons claiming by operation of law, without an equally meritorious claim."

In the case of *Hayes v. Henshaw*, 1 Sandf. Ch. 258, the Assistant Vice Chancellor says, "covenants and agreements, founded on a good consideration, or oftentimes expressed on a meritorious consideration, are however upheld and enforced, specifically, in this court. And it has been a mooted question whether collateral consanguinity, as that of a brother, nephew, niece, &c., was not a meritorious consideration. I think it is now settled, upon authority, it is not. In the case before us, (which was a voluntary, executory agreement, to convey to a niece) there was no moral obligation, to provide for a wife, or children, or a parent: and there was, therefore, no such good or meritorious consideration as will induce this court to decree the performance of the covenant, in the sealed instrument, in question;" but he, with much difficulty, held this instrument and another executed at the same time, taken together, might be construed to constitute an executed trust, and, as such, he enforced them. And in *Bunn v. Winthrop*, 1 Johns. Ch. 329, the Chancellor says, "The grantor, a man of very large fortune, was bound, in reason and justice, to provide for his mistress, and child by her. The innocent offspring of criminal indulgence has a claim, for protection and support,

12

which a court of equity, cannot and do not disregard." This language, however, it should be remembered was used, in a case, in which he held that the trust was not executory but executed.

In Kentucky, by a series of decisions, it is well settled, that a voluntary agreement, by a father with a child, to convey land will be specifically, executed. *McIntire v. Hughes,* 4 Bibb. 186 ; *Mahan v. Mahan.* 7 B. Mon. 579 ; *Bright v. Bright,* 8 B. Mon. 194. But in *Buford's Heirs v. McKee,* 1 Dana 107, it was *decided,* that such a voluntary agreement in favor of a niece would not be specifically enforced. In *McIntire v. Hughes,* the court uses this language : "It is true a court of equity will not enforce the specific execution of a contract which is merely voluntary ; but the obligation by McIntire to his son is, evidently, not of that description. The relation between them, of father and son, is not only alleged in the bill, but is apparent, on the face of the obligation, and that relation, though not a valuable consideration, is deemed, in law, a good consideration.

Under the statute of uses, the proximity of blood, between the father and son, is sufficient to support a covenant by the former to stand seized for the use of the latter; and if so, prior to the statute, it must have been a sufficient consideration, to have created the use; for the statute could only operate to transfer the possession to the use, where there is an use created. Now a use, prior to the statute, was similar to what is denominated a trust since. It gave to the *cestui que use* no right to the thing, but it gave him a right, in equity, to demand the thing. And prior to the statute, it was the common practice to resort to a court of chancery to enforce the execution of a use, as it still is to enforce the execution of a trust. The inference is, therefore, clear, that proximity of blood has always been a sufficient consideration to warrant the interposition of a court of equity, where there was no other circumstance in the case which forbid such interposition.

1876.
June Term.

Marling
v.
Merling.

Whether if the contract is not by deed, a court of equity would, when there is no other consideration than that of blood, decree its specific performance, is not material to decide ; nor is this court to be understood, as giving any opinion, on that point ; for in this case the contract is under seal."

In *Darlington v. McCoole*, 1 Leigh. 42, the contract, sought to be enforced, was a mere verbal one ; the court says, "There is, in this case, neither a valuable, nor a meritorious, consideration ; without one of which, a court of equity will not aid a defective conveyance, much less enforce a bare agreement, even were it in writing ;" though this is an *obiter dictum*, it would seem from it that the court thought that, if there was a meritorious consideration, the court would enforce a contract in writing, though not under seal. In *Jones and Wife v. Obenchain*, 10 Gratt. 250, it was *held* that a deed from a husband to his wife, conveying to her all his property, real and personal, under circumstances showing a strong meritorious consideration, should be set up, in equity, against a nephew, the heir at law, of the grantor.

The case of *Shepard v. Shepard*, 7 Johns. Ch. 63, is referred to by the court as a similar case, and we have seen there are two similar cases, which have been decided, in like manner; in North Carolina. In the case of *Caldwell v. Williams*, Bailey Eq. 175, Chancellor Harper says, "Some agreements which are termed voluntary are executed in this court, when made in favor of a wife or children ; but they are always agreements, by deed or covenants ; agreements under seal, which imports a consideration, and renders them valid, at law. There is no instance of an agreement being enforced, which is not only voluntarily, in the equity sense of the word, but is also *nudum pactum*." But this was a mere *obiter dictum*, as the case before the court was a mere verbal contract.

It would, obviously, be impossible to reconcile these American cases. But we may, safely, say that the prin-

ciple, laid down in *Ellis v. Nimmo*, by Lord Sugden, are approved, by the weight of American authorities.

The question whether a voluntary executory agreement, based on a meritorious consideration, must, necessarily, be under seal before it will be enforced, specifically, by a court of equity, seems to be undecided. We propose now to consider this question. The argument, which makes the aid furnished by a court of equity, in such cases, to depend upon whether the instrument is sealed or unsealed, is thus presented by Lewin in his Treatise on Trusts, 95, "In regard to covenants to stand seized to uses, it is evident that mere meritorious consideration was not sufficient ground to attract the jurisdiction of the court; for no use would have arisen in favor of a wife or child, unless there had been a *covenant*. Lord Chief Justice Holt said (12 Mod. 161) if a use were without transmutation of possession, the use then does not arise by virtue of any declaration or appointment, but there must be some precedent obligation, to oblige the party declaring the use, which must be founded on some consideration; for a use having its foundation on grounds of equity, could not be relieved in chancery without transmutation of possession, or an agreement founded on a consideration—and therefore, if bargain and sale was made of a man's land, on payment of the money, the use would have arisen, without deed, by parol; but if the use was in consideration of blood, then it would not arise by parol agreement without a deed; because that agreement was not an obligatory agreement—it wanted a consideration, and therefore, to make it an obliging agreement, there was necessity of a deed. Thus if equity be governed by a strict analogy of uses, the court cannot act upon meritorious consideration, when the contract is by parol, though when the contract is under seal the analogy applies." This reasoning is unsatisfactory; for a court of equity, has, in many instances, as we have seen, not been governed by a strict analogy of uses. For we have seen that a mere declaration in writing, and in

the case of personal property, a mere verbal declaration
by the owner of property, though unaccompanied by
any deed or any act divesting himself of the legal title,
a court of equity now regards as an executed trust, and
will enforce it, specifically. Again, as we have seen, and
as admitted by Lewin, page 96, a covenant to stand seized
to the use extended to collateral relations; but now a
court of equity never aids a collateral relation ; for a man
is under no obligation to make provision for his collat-
eral relations, but only for his immediate family, his
wife or children. And as another instance of a departure
from the strict analogy of uses, a bargain and sale for
a nominal consideration of $1, still operates, by way of
conveyance, to transfer the estate ; but now if the bar-
gain and sale be void, for want of seal or any other rea-
son, a court of equity would, undoubtedly, decline its
aid to such a bargainee, on the basis of a trust. This
is admitted, by Lewin, page 96, and in the case of Bu-
ford's Heirs v. McKee, 1 Dana 107, the court speaking
of this says, "the idea which seems to have had some
countenance, from a few old cases, that an agreement in
writing would be specifically enforced merely because it
was solemnized by the signature and seal of the party, has
been long exploded." Yet if we were to follow the an-
alogy of uses strictly, such an agreement would now be
specifically enforced. It would seem, therefore, that a
court of equity now looks to the real consideration of
the contract or assignment, and gives, or refuses, its
aid, according to the real merits of the case, disregard-
ing the form the contract or assignment may assume, and
declining to follow the strict analogy of uses, when it
would lead to inequitable results. The argument of
Lewin is, sometimes, varied in form, and it is said there
must be a valid and obligatory contract, as a preliminary
basis, to any equitable interference, and then that equity
grants its extraordinary aid, only where there is an actu-
al consideration, valuable or meritorious. To this form
of the argument Harper Chancellor alludes, when in

*Caldwell v. Williams*, 1 Bailey Eq. 176 he says, "there is no instance of an agreement being enforced, which is not only voluntary, in the equity sense of the word, but is also *nudum pactum* at law." To this form of the argument we would reply by referring to what has been said in reply to Lewin's mode of presenting it, and we would add that there are numerous cases, in which contracts or deeds null at law have been specifically enforced in equity, or been aided where inoperative as a deed.

The case of *Ellis v. Nimmo, supra,* is an example of a voluntary contract, based on a meritorious consideration, not under seal, and, therefore, a *nudum pactum,* or void at law, being specifically executed in equity: And Lord Sugden, in delivering his well considered opinion makes no allusion to the instrument, on which he was acting, being unsealed. He seemed to regard it as immaterial, whether it was sealed or unsealed. The two cases cited from the North Carolina reports of *Huntly v. Huntly,* and *Garner v. Garner, supra*; also *Shepard v. Shepard,* and *Jones and Wife v. Obenchain,* 10 Gratt. 259, *supra,* are all instances of contracts or deeds, void at law, being specifically executed or aided in equity. They were deeds by husbands to their wives utterly void at law, as much so as any voluntary agreement, not under seal. The case too of *ex parte Pye v. Dupost, supra,* and *McFarden v. Jenkins, supra,* and numerous other similar cases, seems to indicate that there should be no necessity that a valid contract or assignment at law should, necessarily, exist before equity furnishes its aid. These cases establishing that a court of equity will, in favor of a mere volunteer, enforce a simple declaration in writing, not under seal, by an owner of property, that it shall be held in trust for the objects of his bounty, we conclude therefore that a voluntary agreement, whether under seal or not, will be enforced by a court of equity, in favor of a wife or child, or a defective conveyance or assignment, whether under seal or not, will be aided in favor of a wife or child, whether it be under seal or not;

but the agreement or assignment should, distinctly, appear to be complete and definite; and this can only appear, with the requisite distinctness, by the formal delivery of the instrument in writing, expressing the agreement or assignment. Such an agreement or assignment should not be deduced from the letters of a parent to a child ; much may be said in such letters that the parent might decline, if called upon, to put in an instrument of writing, and formally deliver. If thus formally delivered, we may, we think, safely and justly, dispense with the seal in all cases. We are the better satisfied with this conclusion, as modern courts of equity are paying less and less regard to mere formalities, and a seal in the United States is becoming more and more regarded as a mere formality. It has ceased to be the solemnity which it was, and much of its effect was due to its solemnity. In several of the States, all differences between sealed and and unsealed instruments are abolished, and in all of them there is far less difference than the common law establishes. We could not adopt the language of Judge Baldwin in *Ortman v. Dixon,* 13 Cal. 36, and say, "The difference between instruments sealed and unsealed is, at least, at this day, a mere arbitrary and unmeaning distinction, made by technical law, unsustained by reason." But still we would not extend the cases in which the use of seals are required, beyond those cases in which they now are, clearly, required ; and we are of the opinion, both on reason and authority, that a seal has not, clearly, been, heretofore, required to make such a paper as the plaintiffs present with their bill, in this case, effective in a court of equity, when its aid is invoked by a child.

There is still another question presented, by the record, in this cause, and which remains to be disposed of. The answer in this case, under the provisions of section thirty-five of chapter one hundred and twenty-five of Code of West Virginia, alleges new matter and prays af-

1876.
June Term.

Marling.
v.
Marling.

firmative relief. This portion of the answer is in these words: "That in executing the paper, filed with the bill, he had no intention of conveying the title, therein, to them, or of putting said farm out of his control, during his life, or of parting with the ownership thereof, or the right to exercise such ownership, or to dispose of said land by executing a deed or will, or in any other manner; and that he has had no such intention, at any time; that he has exercised a general control over said land, has leased it and taken some of the profits thereof, giving his daughters most. The only reason for the execution of that paper, was the fear entertained by the complainants that, at their fathers death, they might need some protection against the other heirs to his estate, and it was understood, by all parties, that said paper was only to operate as a devise of said farm to complainants, in case respondent should die without having disposed of it, and without making other testamentary provision for them. Complainants desired this rather than a scramble for their share of his estate, in case he should die intestate. But it was respondents intention, and as he believes, the understanding of the complainants, that respondent retained the power of revoking said paper, by subsequent will, or otherwise. Respondent denies, that said paper entitles complainant to the conveyance prayed, but says said paper was written, wholly, by respondent alone, and without counsel. Respondent is, and then was, aged, of but limited education, and unaccustomed to express himself in writing, and he says that if the legal effect of that paper is other than to carry out his intention, as now stated, and is to give them any greater rights than he now states he intended, it is so through the ignorance and mistake of himself, and contrary to the intention of the parties thereto, and he prays the court to reform the paper, so as to carry out that intention, as he now states it. Respondent never intended to acknowledge that paper, or to make it operate as a deed to complainants for said land, or to make them

a deed for said land, and at all times would have been unwilling to do so, or to place the title to said land in the control of the complainants, during his lifetime. Nor did the complainants, before the suit was brought, ever apply to him for a deed for said land, but if they had, he would not have made them a deed. It never was intended or understood, by respondent, or as he believes by complainants or either of them, when said paper was given, or at any other time, that any deed was to be made, or other step taken to carry out the purpose, for which said paper was made." No replication was filed to this answer, and the cause was heard, on bill and answer. It is claimed that in the circuit court the cause was heard as though a replication was in, and it is claimed to be a clerical omission that it does not appear to have been filed. But as no depositions were taken, and there is nothing in the record to indicate any clerical omission, and the decree, which is the work of the court, not of the clerk, states that the cause was heard on the bill and answer, this Court must regard the cause as so heard. The thirty-sixth section of chapter one hundred and twenty-five of the Code of West Virginia, provides, in such a case, that a failure to reply, shall have the same effect, as a failure to answer the bill. And in the case of *Campbell v. Lynch*, 6 W. Va. 17, Judge Paull, in an able opinion, concurred in by all the members of the Court, discusses fully what is the effect of taking a bill for confessed. The conclusion reached is, "that when the allegations of a bill are distinct and positive, and the bill is confessed, such allegations are taken as true, without proof. The bill, when confessed by default of the defendant, is taken to be true, in all matters alleged with sufficient certainty ; but in respect to all matters not alleged with due certainty, or subjects which from their nature, and the course of the court, require an examination of details, the obligation to furnish proof rests on the complainant. The complainant is not bound to prove those allegations of his bill which are distinct and

13

positive. If this rule be regarded as too stringent in practice, and is calculated to entrap incautious defendants, a legislative remedy can be readily secured." The answer, affirmatively, asks the court to reform the paper, and to convert it into a devise, by him revocable at his pleasure, which is, in effect, to cancel and annul it. If the allegations in this answer, clearly amount to positive allegations, that, before this paper was executed, it was understood and agreed that the father should make a will devising to his daughters this land which he was to put into their hands, but which he had a right to call on them, at any time, to surrender, if he altered his views; and that in endeavoring to write a will carrying out this agreement, the father, in his ignorance, wrote it in its present form, these allegations, if made positively and being taken for confessed, would have entitled the defendant to the cancellation of said paper. But we think the allegations of the answer do not amount to such allegations, at any rate, they do not, distinctly, amount to such allegations. Thus in one place he says, "it was respondents intention, and he believes the understanding of the complainants, that the respondent retained the power of revoking said paper, by subsequent will, or otherwise." This, certainly, is not a positive allegation, that "the agreement was that, in the paper to be drawn, such power was to be reserved to him." On the contrary, the fair inference is that there was no such agreement, otherwise he could, hardly, have used the language that he believed the complainants had that understanding—and this too is inconsistent with any declaration of such intention by the father, before the execution of the paper. We think the whole statements of this answer is on this subject, which are vague and indistinct, might bear the interpretation, that he did not know the effect of the execution of this paper, and though he did not inform his daughter that he intended to reserve the power of revoking; when he pleased, yet he so interpreted the paper he executed and delivered to them, and he

supposes they so understood the paper. If this be the interpretation of the vague and rather contradictory statements of the answer, then it being taken for confessed, amounts to no admission of facts, such as would entitle the respondent to have this paper reformed or cancelled. In fact it would amount to but little more than what appears on the face of the bill, for the defendant's counsel insist that this interpretation, placed by the father on this paper, is its true interpretation, and we have seen that this interpretation has been sustained by high authority.

We think there is nothing in the position that the complainants have lost their right to the aid of the court, by their unreasonable delay... The answer, in a portion not above quoted, admits that the complainants have been in possession of the farm ever since the execution of this paper, and in fact long before—this will, effectually, prevent lapse of time from affecting their rights. Though the paper is spoken of in the bill as vague and uncertain, yet with the facts stated in the bill and admitted in the answer, the description of the property is ample to prevent any mistake as to the meaning of the paper. Its vagueness, therefore, is no reason why this contract should not, be specifically, enforced.

The decree of the circuit court, of the twenty-third day of August, 1876, must be affirmed, and the appellee's recover of the appellants, their costs about this appeal expended, and $30 damages.

The other Judges concurred.

DECREE AFFIRMED.