Richmond.

STOKES AND ALS V. OLIVER AND ALS.

January 12, 1882.

PAROL GIFTS—WHEN VALID *quoad* CREDITORS OF DONOR.—In 1853 and 1855 S owned estate of much value, and owed but one debt, for which his sons, H and R, were sureties. In 1853 he induced H to sell out in L and settle on a farm in P E assessed at $13,800, which he agreed to give H if H would pay him $2,500. H paid the money. In 1855 S exchanged with R a farm in P E. assessed at $15,000, for lands in L assessed at $2,500. S placed H and R in possession of the respective farms, and they held notorious and adverse possession of, and made valuable improvements and paid taxes on same until 1869. S also gave to his daughter, B, the land in L adjacent to the land occupied by her already, and she held it openly and cultivated it as her own until 1869, but made no valuable improvements on it. No conveyances were made until December, 1863, when S conveyed the said farms to H, R, and B, respectively, by deeds declaring that they were, in consideration, respectively, "of natural love and affection and $2,500," "of natural love and affection and certain lands," and "of natural love and affection." After these alienations were made, S retained estate ample to pay not only what he owed in 1855 but what he owed in 1863. In 1865 S died insolvent. In 1869 O, whose debt was contracted before 1853, and other creditors, whose debts were contracted after that date, filed a bill to annul these deeds as *voluntary* and void as to them and to subject the lands to pay their debts.

HELD :

1. The bill should have been dismissed as to H and R, the parol gifts to whom were not only in part supported by valuable considerations, but who were also induced by the donor to alter their conditions and to expend money in valuable improvements on the land.

2. The deed to B was *voluntary*, and void as to the creditors of S. B had not been induced by reason of the parol gift to alter her con-

dition, and to expend money in valuable improvements on the land. There was nothing in her case whereon she could have founded a claim for specific performance. See *Burkeholder* v. *Ludlam*, &c., 30 Gratt. 255.

3. The suit was not barred by Code 1873, ch. 146, § 16.

ANDERSON, J., dissenting—

HELD:

Gift to B. also valid *quoad* creditors of donor.

Appeal from decrees of circuit court of Henrico county in suit of J. B. Oliver and other creditors of Colin Stokes, deceased, against Henry Stokes, Richard Stokes, Robert S. Bagley and Susan, his wife, children, and Sarah M. Stokes, widow of Colin Stokes, deceased.

The object of the suit was to annul conveyances of land lying in Lunenburg and Prince Edward counties, made in December, 1863, by the decedent to Henry Stokes, Richard Stokes, and Susan Bagley, as voluntary and on that account fraudulent and void as to the creditors of the decedent, whose debts were contracted before the execution of those conveyances. The defendants, Henry Stokes, Richard Stokes, and Bagley and wife, answered the bill, denied that the conveyances were voluntary, averred that they were made in consummation of sales and arrangements made in 1853 and 1855 between themselves and their father when he was free from debt and possessed of much estate, and pleaded the bar of the statute of limitations. The circuit court decreed, February 25, 1875, that the deed to Susan Bagley was voluntary and void, and that the deeds to Henry and Richard Stokes, respectively, were voluntary and void as to the excess of the values of the lands to them conveyed, over the sum of $2,500, paid in money and in land by them respectively to the grantor, and directed the sale of the lands. From this decree Henry and Richard Stokes and Bagley and wife appealed. The opinion of the court fully states the remaining facts.

*H. F. Lee,* for appellants.

*William H. Mann,* for appellees.

ANDERSON, J., delivered the opinion of the court.

This is a suit by creditors of Colin Stokes, deceased, to subject lands held severally by the appellants—Henry Stokes, Richard Stokes, and Robert S. Bagley and Susan, his wife—to the payment of his debts.

The following are, I think, established facts in the cause: Henry, Richard and Susan were the only children of Colin Stokes. In 1853 he made a contract with his son Henry, who was then settled upon a farm which he owned in the county of Lunenburg, that if he would pay him $2,500 in cash he would give him part of a tract of land, according to certain boundaries, which he owned on Bush river, in the county of Prince Edward, the whole tract containing 2,395¾ acres, and the part he proposed to lay off to his said son, as shown by survey, 1,109¾ acres. Henry accepted the offer and sold his Lunenburg farm, with some personal property, for cash, and paid his father the $2,500 in cash; and in the month of December, 1853, his father put him in full and exclusive possession of the Bush river land, to which he removed with his family and all his effects, and has held full, notorious and exclusive possession thereof ever since, paying the taxes on it and making large expenditures in building thereon, and in the improvement of the land; and in further execution of said contract, the said Colin Stokes, in 1863, about ten years after, executed a deed conveying to him the legal title.

In the year 1855, the said Colin Stokes exchanged the residue of said tract of land, containing by survey 1,286 acres, with his son Richard for a tract of land which he

held in Lunenburg, and upon which he resided, consisting of two tracts—one containing 511 acres, called the Taylor tract, and the other containing 775 acres, called the Epps tract—together, 1,286 acres.   The tracts exchanged contain each exactly the same area of land.

Pursuant to this contract of exchange, which was also oral, Richard Stokes broke up his home in Lunenburg and gave his father possession of his Lunenburg farm, which he afterwards conveyed to him, and removed with his family, slaves and effects to the place he got from his father in exchange for it, in the county of Prince Edward, from which his father removed his slaves and other personal property, and gave him the full and exclusive possession thereof from that time until the present, cultivating and paying the taxes thereon, and improving the same. And in the further execution and confirmation of said contract of exchange, the said Colin Stokes in 1863 executed a deed conveying to him the title.

In the same year (1855), and it seems immediately after said exchange with his son Richard, Colin Stokes gave the said tract of 1,286 acres which he got from his son Richard to his daughter, Mrs. Susan Bagley, the wife of Dr. Robert S. Bagley, and immediately after the removal of his son Richard put Dr. Bagley in possession thereof, who has held the entire, notorious and exclusive possession under said gift to his wife ever since, cultivating and using said land and paying the taxes thereon, just as he cultivated and used and paid taxes on his other lands, of which he was an extensive proprietor.   And in 1863, in confirmation of said gift and in further execution thereof, the said Colin Stokes executed a deed conveying the title to his said daughter. It appears that the execution of the deeds aforesaid was delayed merely from inattention.

It is also a fact, I think, established by the record, that in 1853 and 1855, when these transfers of land were made

by Colin Stokes to his children, they did not exceed a reasonable advancement to them out of his large estate, and that he was then in condition to have honestly, and in good faith, made such an apportionment of that portion of his his estate amongst his children.

He was not at that time owing any of the debts (as was conceded at the bar) for the satisfaction of which this suit was brought, except the debt he owed Oliver, which was well secured, Henry and Richard Stokes, who held very considerable estates independent of their father, being two of the sureties, and have since paid the debt. All the other debts were subsequently contracted. Indeed, it does not appear from the record that he was owing any debt, except that due Oliver, at the time he made these transfers of land to his children; and that debt being secured by the personal obligations of Richard and Henry, two of the grantees, it repels the allegation of fraud which is made in the bill and denied by the answers, and which is not supported by any evidence. The proof is clear, that at the time these transfers were made, the portion of his estate which Colin Stokes retained was ample to pay not only what he owed at that time, but all he owed in 1863, when the deeds were executed—leaving him the owner of an unencumbered estate of more than $30,000. And I am satisfied that the debts contracted by Colin Stokes subsequently to 1855, for the payment of which the lands which were transferred prior thereto to his children are now sought to be subjected, were not contracted upon the faith of those lands, but upon the faith of the property which he retained, and which was largely more than was necessary for their payment.

The land which Henry Stokes got from his father was of value greatly in excess of the price he paid, being valued by the commissioner at $13,871.87, and evidently was intended by the father as an advancement to him to the amount of the excess.

The land which Richard Stokes got was more valuable than the land he gave him in exchange for it. The witnesses say that there was not much difference—only from $2 to $2.50 per acre. But to this should be added $1,121, which Colin Stokes probably paid of the purchase-money, which was paid for the Epps tract, which, as we have seen, was part of the land he got from his son in the exchange. The whole of the purchase-money for the Taylor tract, which was purchased by Richard Stokes, and is part of the land he gave his father in exchange, was paid by Richard. But adding $1,121 to the difference in the value of the two tracts exchanged, it would still fall far short of the value of the land Henry got, minus the sum of $2,500, which was charged on it, and which he paid. This will account for the payment of $2,500 by Colin Stokes to Richard, as appears from the deed, which is the exact amount he received from Henry. And it is a strong circumstance in support of the hypothesis that in these transactions the intention of Colin Stokes was to make an apportionment of his estate amongst his children. But still his advancement to Richard was not equal in value to what Henry had received. But the cash payment to Richard lessened the inequality.

He does not appear to have advanced his children at that time with exact equal portions of his estate. The land he gave his daughter was not equal in value to the land he gave Henry, charged as it was with $2,500, but was perhaps greater in value than the amount he actually advanced to Richard. But he was giving them portions out of only a part of his estate, and might well have considered that he could equalize them (if equality was his purpose) in the final disposition of his estate.

I think it is evident that these arrangements were made by Colin Stokes with the intention of giving to his children portions of his estate, by way of advancement, and

that he was in condition to make the apportionment honestly and in perfect good faith as to all the world, and that he so made it. And his subsequent creditors, who credited him not upon the faith of that property, which was not his, and which he did not claim, but upon the faith of the property which he retained, and which was ample, had no right to complain of that settlement, or to impeach it, or to subject the property which he had so disposed of, before they became creditors, to the payment of their debts.

This, I think, is perfectly clear as to Henry and Richard Stokes. The cases are stronger in their favor, even if there had been no valuable consideration received, but was purely a gift from a father to his sons, than the case of *Burkeholder* v. *Ludlam and als.*, decided by this court, and reported in 30 Gratt. 255. I am of opinion that Henry and Richard Stokes are entitled to hold the lands which were afterwards conveyed to them respectively by deeds, and that they are not liable for the appellee's debts. And in this the whole court concurs.

I am also of opinion that Mrs. Susan Bagley is equally entitled with her brothers to hold the land which was advanced to her by her father, free from the debts which he afterwards contracted.

I regard the whole transaction between the father and his three children as one. The purpose was evidently formed in the mind of Colin Stokes before he contracted with Henry, and was, most probably, known to all his children, that he would divide his valuable estate on Bush river, in Prince Edward county, between his two sons, and acquire from Richard his farm in Lunenburg county for his daughter, which adjoined her husband's farm, on which they resided. To carry out this plan he required Henry to pay him $2,500 for the part of his Prince Edward farm which he intended for him, and the residue of said farm he proposed to exchange with Richard for his Lunenburg

farm; and although it was of less value and he had already advanced $1,121 of the price paid for it to pay him the $2,500 he got from Henry, to make the advancement to him more nearly equal to Henry's advancement, and then to give the Lunenburg farm to his daughter, which would make her advancement fully equal to Richard's and nearly equal to Henry's. I think this is a fair inference from the facts and circumstances proved, the relation of the parties, and the transaction itself. And it refutes the idea intimated by counsel that it may not have been intended as a gift of the fee to his daughter. The transactions with his children were mutually dependent. If one was invalid it would affect the others. It was part of the consideration of his getting Richard's Lunenburg farm that he might give it by way of advancement to his daughter that he exchanged a part of his Prince Edward farm for it. It is hardly probable that the lands his sons received would have been transferred to them, except with the understanding that their sister should get the Lunenburg farm. So that it was all one transaction, and Mrs. Bagley ought to stand on the same platform with her brothers. Her land should not be subject to the debts, while her brothers' are held to be exempt, thereby throwing the whole burden on her advancement, her brothers bearing no proportion of it.

The fact of Colin Stokes having agreed to advance his daughter the Lunenburg farm is as clearly established as the advancements to his sons—and there is no ground for doubt, or question as to either. And his agreement to advance them was executed to all of them alike, and to the same extent, by delivering to each full, exclusive and notorious possession, which they held uninterruptedly with his consent and approval, and without objection from any one, so far as this record shows, until the institution of this suit in 1869; in the meantime, in 1863, recognizing and confirming the appointments made in 1853 and 1855, by

·executing a deed to each of them for their respective portions. As to the sons, the proof is clear as to their expending money—especially as to Henry—in the improvement ·of their lands. But as to Mrs. Bagley there is no proof, ·except what is inferential, from the fact proved that'her husband, during all this intervening time, held the exclusive and notorious possession of her land, paying the taxes ·on it, and cultivating it as his own land, which could not have been done without expending money and labor upon it.

The deeds he executed in 1863 were a recognition of his ·obligation and a confirmation of the advancements he made his children in 1863. It was as much a confirmation of his advancement to his daughter as it was of his advancements to his sons. The execution of the deeds in 1863 was not in pursuance of any new contract then made, but in fulfillment of agreements which he had *bona fide* made with his children in 1853 and 1855, and which we have seen that he had then a perfect right to make. There was no one to gainsay ·or to object, or who did object, or who had any right to ·object. And when, in 1863, he confirmed the said apportionment, no one had a right to object, or did object. It is true he had then contracted a large amount of debt, ¯but which the property he had retained when he advanced his children in 1853 and 1855, and which he still owned, ¯was amply sufficient to pay, and to leave him a good estate; ·and those debts were contracted on the faith of that estate, and not upon the lands which he had apportioned to his children, and which were regarded by the whole community, all the time, as his children's lands, and not his.

Though a voluntary gift to his children in 1863 would ¯not have been exempt from the debts he then owed, the gifts to his children by way of advancement were not made at that time. The deeds which he executed at that time ·passed only the legal title to property, the beneficial interest in which had long since passed from him to his chil-

dren *bona fide*, at a time when he had a perfect right to pass it to them. The deeds only passed to them the naked legal title, which had remained in him from sheer neglect and inattention.

There is no ground to impute fraud to Colin Stokes in the execution of those deeds. They were not made with intent to delay, hinder, or defraud his creditors, but were *bona fide* made in the fulfillment of an agreement which he had made with them years before, and had partly executed by delivering full and exclusive possession. The intent was merely to invest them with the naked legal title to what they were already the beneficial owners of. And for the payment of the debts which he afterwards contracted he retained property which, in 1863, when the debts were contracted and when the deeds were made, of more than double the value of the amount of the debts upon which the creditors relied for payment, and upon the faith of which they had contracted. It is evident they did not then look to the lands which he had apportioned to his children, and of which they had held the continued exclusive possession for eight or ten years, as his property, but regarded them, as they were by all the community, as the lands of the appellants. And they indulged him, regarding his property as ample security, until the larger part of it was lost by the result of the war, and now seek by this proceeding to subject the appellant's property, of which they had held the undisturbed and undisputed possession, and beneficial ownership for fifteen or sixteen years, with the legal title thereto also, for six years undisputed, to satisfy their said debts.

And they rely upon the statute which declares that "no estate of inheritance or freehold, or for a term of more than five years, in lands, shall be conveyed unless by deed or will." (Code of 1873, ch. 112, p. 887, § 1.)

In many cases it has been held that a parol gift of land

will be enforced specifically in equity if possession is taken pursuant to the gift and money has been expended in improvements. *Lessee of Tyler* v. *Echart*, 1 Binny, 380; *Bright and als.* v. *Bright*, 41 Ill. Rep. p. 100; *Burkeholder and als.* v. *Ludlam and others*, 30 Gratt. 255. In such cases courts of equity hold that although there has been no conveyance by deed or will, the party has an equitable title and the conveyance will be decreed. In those cases, as in the case of Henry and Richard Stokes, money had been expended in making improvements on the land, of which there is no direct proof in the case of Mrs. Bagley.

There are other authorities to the effect that if the parol contract for land is accompanied with the possession, the purchaser is entitled to the specific execution, without showing any other acts of performance. Brown, in his treatise on the Statute of Frauds (§ 467, p. 536), says: "It is well settled that possession alone, without payment or other acts of ownership, is sufficient part performance of a verbal contract for land to sustain a decree for its specific execution." And he cites a long list of authorities in support of it. "When the purchaser," he says, "goes into possession, and rests upon that act his claim for the specific execution of the contract, our reason for allowing that claim is, that if there be no agreement valid in law or equity, he is made a trespasser, and is liable as a trespasser; a position which would amount to a fraud practiced upon him by the vendor." And he cites Mr. Justice Story, who says: "For the purpose of defending himself against a charge as a trespasser, and a suit to account for the profits in such a case, the evidence of a parol agreement would seem to be admissible; and if admissible for such a purpose, there seems to be no reason why it should not be admissible throughout." Stor. Eq. Juris. § 761.

This reasoning is just as applicable to a gift, when possession is given in pursuance of it, as to a contract of sale;

although the first author above named says : In the case of a gift something more seems to be required than the mere taking possession, as, for instance, the expenditure of money on the estate by the donee, upon the faith of the gift. If it be true, as asserted, that payment of purchase money is not necessary as an act of performance, it follows that valuable consideration is not necessary to support the promise, but that when it is founded upon meritorious consideration, accompanied with delivery of possession, it may be specifically enforced; which, I think, is intimated by Judge Allen as his opinion in *Jones and Wife* v. *Obenchain*, 10 Gratt. 259. In *Lessee of Tyler* v. *Echart* (supra), Ch. J. Tilghman, speaking for the court, said : "It has been settled that when a parol agreement is clearly proved, in consequence of which one of the parties has taken possession and made valuable improvements, such agreement shall be carried into effect. We see no material difference between a sale and a gift." And if it be settled that where a purchaser by parol agreement is let into possession he is entitled to specific performance, without proof of the expenditure of money in improvements, for the reason given by the author, I can see no material difference between a sale and a gift.

But be that as it may, which I do not deem it necessary to be decided in this case, because it is not a suit against the donor for specific performance, performance has never been refused or resisted by him, but has been actually made by the execution of a deed to Mrs. Bagley, as well as to her brothers. And although she had not the naked legal title before the execution of the deed, she had the beneficial interest and the equitable title, as was even recognized by the donor, and confirmed by him by the deed which he subsequently executed *bona fide*, in the absence of all fraud, and with the tacit assent and acquiescence of his creditors, for a period of six years subsequently thereto, and they should not now be allowed to resist the specific performance

of a valid and *bona fide* agreement which has been made, and so long acquiesced in, upon the pretext that the record does not show that Mrs. Bagley, the donee, had made valuable improvements of the land which she held under the gift. If she had made improvements they would have been for her benefit, and not for the appellants. And the inference is, from what is proved, that she, through her husband, did expend labor and money in the cultivation of the land and its melioration presumptively, which only inured to her benefit, as would buildings if she had erected them.

But if this equitable view cannot be maintained, and the deed made by Colin Stokes to his daughter in 1863 was void as to debts which he contracted prior to the date of said deed, and which were then subsisting and unsatisfied debts, by section 2 of chapter 114 of the Code of 1873, more than five years having elapsed since said conveyance was made before the institution of this suit, to avoid said conveyance, and the land so conveyed to Mrs. Bagley, or any part of it, not having been in the meantime distrained or levied upon by or at the suit of a creditor as to whom such gift or conveyance is declared to be void by the second section of chapter 114, above cited, I am of opinion that said suit is barred by section 16 of chapter 146, Code of 1873, p. 1001.

I am of opinion, for the foregoing reasons, that the decree of the circuit court should be reversed, and the bill of plaintiffs dismissed as to all of the appellants. But a majority of the court not concurring as to R. S. Bagley and Susan, his wife, the decree will be to reverse and dismiss the bill as to Henry and Richard Stokes, and as to R. S. Bagley and wife to affirm.

REVERSED as to Richard and Henry Stokes, and AFFIRMED as to R. S. Bagley.