# WHEELING.

## FRAME *v.* FRAME.

*(BRANNON, JUDGE, Absent.)

Submitted January 17, 1889.—Decided June 26, 1889.

1. SPECIFIC PERFORMANCE—PAROL CONTRACT—GIFT.
    A court of equity will enforce a verbal promise made by a father to a son in consideration of love and affection to give him land and to make him a deed therefor, if the son induced by such promise has taken possession of the land and expended on it labor and money in improvements. (p. 475.)

2. SPECIFIC PERFORMANCE—CONDITION PRECEDENT.
    But if, when such gift was made, the father required the son in a given time to put specified improvements on the land, such requirement would be regarded as a condition precedent to the right of the son to demand a deed ; and the son, before he could acquire such deed, would have to prove that he put on the land in the time specified the specified improvements. (p. 483.)

*Rendered judgment below.

3. Specific Performance—Condition Precedent—Trusts and Trestees—Notice.

When the donor (the father) has put the donee (the son) in possession of the land, and the donee has fulfilled the conditions precedent attached to his gift and by improvements on the land acquired the equitable title thereto, a court of equity will regard the donor as trustee for the donee, and the possession of the donee of itself conveys notice to the world of his equitable title, and of his right to the legal title. (p. 477.)

4. Specific Performance—Laches.

But if the donor sells this land, and the legal title passes into the hands of persons, who are purchasers for valuable consideration without any actual notice of the donee's equity, and if the donee knowing that the donor has parted with his legal title, instead of promptly asserting his right to demand the legal title to the land delays the assertion of such demand for nineteen years and until after the death of the donor and of all others present, when the verbal gift was made, a court of equity will not enforce the making of the legal title to such land to such donee because of his laches. (p. 481.)

5. Specific Performance—Laches.

In such case, even if the rights of a third person had not intervened, a court of equity, if a suit to compel the donor to convey the legal title to the donee was not instituted for thirty one years, would not grant relief, if there was any trouble about the terms of the agreement or the conditions, on which the deed was to be made by the father to the son. (p. 482.)

Statement of the case by Green, Judge:

This was a chancery suit brought September 12, 1887, in the Circuit Court of Braxton county. The bill was filed at October rules, 1887, and it alleged, that the plaintiff, L. M. Frame, was the son of William B. Frame, deceased, who was a former resident in said county; that the plaintiff lived with his father and worked aided and assisted him on his farm till the plaintiff married on May 1, 1885; that the said father owned seven or eight different tracts of lands in said county, and being desirous of compensating the plaintiff for his services and of starting him in life proposed to him, if he would go upon a certain tract of land containing 100 acres situated on the south side of Elk river about one mile from Frame's mill in said county,—and cultivate and improve the same, that he would give him said land and make him a deed therefor; that that tract was granted to said William B. Frame by the commonwealth of Virginia by

patent dated September 30, 1846, a copy of which is filed with the bill showing the metes and bounds of the tract; that the plaintiff accepted the proposition and on or about May 12, 1855, moved upon said tract of land and has ever since lived upon said land claiming, as the bill says, and holding the same adversely to all the world openly, notoriously and exclusively from that day to this, a period over thirty two years, and that he still owns, possesses and claims the same; that some years after the plaintiff moved upon said tract of land, his father became the surety of one A. W. Wilson on a constable's bond in the month of May, 1868, and being apprehensive, that he might be made liable by reason of such suretyship for the default of said Wilson, he determined to convey all of his lands to his two. sons, John W. Frame and Thomas J. Frame, and accordingly by deed bearing date the 26th of May, 1868, a copy of which was filed with the bill, he conveyed to his said two sons seven different tracts of land, one of the said tracts being the same tract, which thirteen years previously he had granted to the plaintiff and placed him in possession of; that the plaintiff is not advised why his father included the plaintiff's land in said conveyance; that "Certain it is, that it was never intended by his father or by his brothers to deprive him of the ownership or possession of said tract of land, even if they could legally have done so. His said brothers well knew all the facts in relation to the agreement under which he went into possession of said land; well knew his long possession, improvement, and cultivation of the same, and well knew he was entitled to a deed therefor. In fact, they never disputed the plaintiff's right to said land, never attempted to oust him from the possession thereof, never set up any claim thereto, nor did any act in the least tending to assert a claim thereto, except as hereinafter stated. The character of said conveyance was well understood by the said William B. Frame and his said two sons, the said William B. Frame remaining in possession of said lands, except the tract sold to the plaintiff, until his death, and paying taxes thereon, except the tract owned by the plaintiff, the taxes upon which were paid by the said plaintiff. It was not until July, 1886, that either of said brothers did any act which in the slight-

est asserted any claim to the plaintiff's land. On the 1st day of July, 1886, John H. Frame, by deed of that date, conveyed an undivided half of five of said tracts of land, including the tract owned by the plaintiff, to George Goad, trustee, to secure to Jelenko & Bro. the sum of $482.54, evidenced by a negotiable note of that date and payable six months after date, also to secure to Jelenko & Loeb the sum of $536.54, evidenced by note of that date, payable six months after date, with provision that upon default of payment of said notes or either of them said trustee should, upon request of the holder of said notes or either of them, sell the said undivided half of said land according to law for cash. A copy of said deed is here filed as part hereof, marked 'Exhibit No. 3.' The firm of Jelenko & Bro. is composed of the defendants Jacob Jelenko and Gustavus Jelenko, and the firm of Jelenko & Loeb is composed of the defendants William Jelenko and Charles Loeb. At the time of the conveyance by John H. Frame to said George Goad, trustee, the plaintiff was still in the open, notorious and exclusive possession of said 100 acres of land, and by law the said George Goad and Jacob Jelenko and Gustavus Jelenko and William Jelenko and Charles Loeb had constructive notice of the rights of the plaintiff to said 100 acres of land and his ownership thereof, and, in addition thereto, had actual notice of such right and ownership. That on the 22d day of August, 1877, the said John H. Frame having made default in the payment of said notes, the said George Goad, as trustee, sold the said undivided one half of said five tracts of land, including the plaintiff's tract of 100 acres, at public auction to the highest bidder, at which sale the said defendant Charles Loeb became the purchaser of said undivided one half of said five tracts of land, including the land of plaintiff, at the price of $700.00. That the said George Goad is about to convey the same to the said Loeb by a deed as such trustee. The plaintiff says that the said deed from William B. Frame to his sons Thomas J. and John H. Frame, and the trust-deed from the said John H. Frame to the said Goad, constitute a cloud upon the title of the plaintiff to said 100 acres of land; and the deed from Goad to Loeb, when made, will still further cloud his title. He is

advised that he has a right to have said clouds removed, and to have specific execution of his said contract, made with his said father, and the legal title to said land conveyed to him. He therefore asks that said contract be specifically executed; that the said George Goad be restrained and enjoined from conveying the undivided one half of said 100 acres to the said Charles Loeb; that the said John H. Frame, Thomas J. Frame, George Goad, and the parties secured by said deed of trust, be held to have no interest in said 100 acres of land; that the clouds arising from the conveyance hereinbefore set out be removed by this honorable court; that the said John H. Frame, Thomas J. Frame, and George Goad be required to unite in a deed conveying said 100 acres of land to the plaintiff, and that he have such other, further, and general relief as the court may see fit to grant."

The parties defendant to this bill were the plaintiff's said two brothers and the trustee, George Goad, and said two firms secured by said deed of trust and Charles Loeb, the purchaser of this tract of land at the public sale under the deed of trust. The exhibits referred to in the bill were all filed with it. The following is the answer of Thomas J. Frame filed December 5, 1887:

"To the Hon. Henry Brannon, *etc.*—Defendant, for answer to said bill, says that he does not desire to controvert the right of the said L. M. Frame to have specific execution of his contract, as set out in said bill, and he here tenders a deed for all his right, title, and interest in the said 100 acre tract of land, and, having answered, asks to be hence dismissed, with his costs. THOMAS J. FRAME."

The deed referred to in this answer was filed with the answer; and thereupon the following order was made:

"Thomas J. Frame this day filed his anwer to plaintiff's bill, to which the plaintiff replies generally, and the said Thomas J. Frame, having by his answer tendered a deed for all his right, title and interest in the tract of 100 acres of land in the bill mentioned, which deed is accepted by the plaintiff, it is ordered that this cause be dismissed as to the said Thomas J. Frame, but be retained for further proceedings against the other defendants; and said L. M. Frame hath leave to withdraw said deed from the papers of this cause."

At the October rules, 1887, all the other defendants other than John W. Frame filed their joint and several answer, which was as follows:

"These defendants, for answer to said bill, say that it is true, as alleged in the plaintiff's said bill, that defendants Jelenko & Bro. and Jelenko & Loeb were creditors of John H. Frame in the sums and at the times set out in the plaintiff's bill, respectively, and for which the said John H. Frame, in order to secure them in their respective sum on the —— day of ——, 188–, conveyed to the defendant George Goad, trustee, his undivided half interest in the five tracts of land in the plaintiff's bill mentioned, situated on Elk river, near Frame's Mill, in Braxton county, among which was a tract containing 100 acres, claimed by the plaintiff in his bill filed in this cause. It is also true that the said undivided half interests in the said five tracts of land conveyed to the said George Goad, trustee, as aforesaid, were on the 22d day of August, 1887, by order of the defendants Jelenko & Bro., and Jelenko & Loeb, sold by the said George Goad, trustee, after giving notice as required by law, at public auction, at the front door of the court-house of Braxton county, for cash, to Charles Loeb, at the price of $700.00, he being the highest bidder therefor, which amount was paid on day of said sale by said Loeb. A deed was obtained by said Loeb from said trustee, on 1st day of October, 1887, which is here filed, marked 'Exhibit No. 1,' and made part of this answer. These respondents deny that the plaintiff ever had any title, or semblance of title, to the said 100 acres of land claimed by him in his said bill, or that his possession thereof was adverse and exclusive for the period of time alleged in his bill, or it ever was so held by him for any period of time from the time his said father obtained his grant from the commonwealth of Virginia therefor to the present time. These respondents here expressly deny ever having had any notice, either actual or constructive, of any claim of title by plaintiff to said tract of land, or of any right thereto by him whatever. These defendants, for further answer, say that they are advised and believe and charge that plaintiff never had any contract of purchase with his said father for said 100

acres of land, but that, if he had any such contract, it was without consideration, and can not affect the title of either George Goad, trustee, or defendant Charles Loeb, to said land; that if the plaintiff ever occupied, resided on, or controlled in any manner said tract of land in the life-time of his said father, it was a mere tenancy at will, and not under a contract of purchase. These defendants also deny that William B. Frame, in his life-time, ever made plaintiff any proposition to the effect that if he (plaintiff) would move upon said 100 acres of land, and improve it, that he would give said land to him. These defendants, having answered fully all material allegations in the plaintiff's bill charged, pray hence to be dismissed, with their costs in this behalf expended, and they will ever pray," *etc.*

The exhibits referred to in this answer were filed as exhibits with it. Depositions were taken both by the plaintiff and by the defendants.

The plaintiff proved by one witness, a nephew of William B. Frame, that the plaintiff, L. M. Frame, had had possession of and lived upon the 100 acre farm named and described in the bill for thirty one years, ever since 1856; that he, the witness, went to the residence of plaintiff's father one morning in 1856, and William B. Frame told him he had given the plaintiff, "Lemuel, a farm yesterday morning," and he pointed out this 100 acre tract, which was in sight, "across the river," as the farm he had given him; that he said he had given his other lands to John and Thomas, his sons; that he said that "Lemuel could go to work, or starve;" that he said they would have to give a woman, who was in the house on this farm, two bushels of corn in order to get her to leave and give up the house to Lemuel, so he could move in; that Lemuel Frame, the plaintiff, moved on to the place a week or ten days afterwards, and has been in the occupation of it ever since. The witness proved also, that he had since then gotten timber-trees off this tract of land; that he got the timber-trees of the plaintiff, L. M. Frame who always claimed this as his farm; that these trees were sawed for the witness at the mill of the plaintiff's father, William B. Frame, who knew, where they came from, but set up no claim to them; that he never disputed about them and never claimed,

that the plaintiff, L. M. Frame, did not own this tract of land, as he claimed.

The members of William B. Frame's family,—his wife, sons and daughter and a son of the plaintiff's family,—who were all examined, all testified, that they had never heard of William B. Frame's giving his sons John H. Frame and Thomas J. Frame any lands in 1856, as had been testified to by their cousin. But the daughter testified that she had lived with her father in 1856 up to 1864, and that at that time she heard him say frequently, he had given L. M. Frame the farm he claimed in this suit; that he moved on the land within a month, after it was given to him, and has lived on it ever since; that her father always called it "Lemuel's place."

The widow of William B. Frame, whom he married in 1864, testifies that she heard the same statement made by William B. Frame frequently; that she never heard him say, he had given any other lands to his other children in 1856.

The plaintiff himself testified, that he had lived on the 100 acre farm in controversy since the 18th or 20th of May, 1856; that his father gave it to him, and he moved on it and occupied it as his own, and he did not occupy it as a tenant of his father; that his occupancy of it had been open, notorious and visible ; that he has cultivated the land, cleared it, fenced it and cut saw-logs from it ; that he cleared and fenced of it some seventy two acres ; that the whole of this was fenced prior to 1871; that he has planted on it 800 apple-trees and some fifty peach-trees, and, while the house he lived in was on the land, when he went there, he had put up another house on the land and a log stable; that John H. Frame and Thomas J. Frame, his brothers, to whom he had conveyed this and other tracts of land in 1868, frequently got timber-trees off of the land, buying them from him and not disputing his ownership of the land; that John H. Frame had in this way bought of him timber from this land in 1868 and 1869.

The plaintiff's son proved, that about eighteen months ago his father had offered to sell this farm of 100 acres to one T. A. Reip at $50.00 for the house and garden and $1.00 apiece for the bearing apple-trees and walnut-trees; that wit-

ness told John H. Frame of this offer, which had been declined; that J. H. Frame said witness's father had better reduce the price of the trees to fifty cents, rather than miss the sale; that he knew John H. Frame on several occasions to buy a stick of timber from this tract of land and pay witness's father for it; that his father had lived on this land from his earliest remembrance, and he was now thirty years old; that his father always claimed the farm as his own, and every one spoke of it as his father's farm; that his father had cleared and inclosed about three fourths of it; that on the other fourth was a maple-sugar orchard of fifteen or sixteen acres, from which his father made sugar every year; that he knew of his father more than once selling a stick of timber from this land to his grandfather, William B. Frame; that his grandfather bought one of these sticks of timber about 1866; that William B. Frame died in 1876.

It was also proved by other witnesses, that the plaintiff, L. M. Frame, had lived on this tract of land some thirty years; that during all that time he claimed it as his own farm; that, although it was taxed to his father, William B. Frame, till 1868, and after that to John H. Frame and Thomas J. Frame, yet the taxes were always paid by plaintiff, L. M. Frame; that about 1882 he refused to pay the taxes on this tract of land, unless the sheriff made out a separate receipt for this tract and did not have it, as it had been, on the receipt for the taxes of all the lands owned by John H. Frame and Thomas J. Frame; and that after that a separate receipt was made out by the sheriff for this tract of land; that the defendants, Jelenko & Bro. and Jelenko & Loeb were wholesale merchants doing business in Charleston, Kanawha county, W. Va.; that John H. Frame was a retail merchant at Frametown, Braxton county, W. Va.; that he purchased goods of these two wholesale firms in 1882 and continued thereafter to do so; that when he commenced doing business with these firms, they made inquiry of the clerk of the County Court of Braxton with reference to his financial condition, and what real estate he owned, and with what personal property he was taxed, and whether there were any liens on his property; that they were informed, that he owned a moiety of the seven tracts of land conveyed to him and his

brother, Thomas J. Frame, including the 100 acre tract now claimed by the plaintiff, L. M. Frame; that at the foot of a copy of the deed for these seven tracts of land from William B. Frame to Thomas J. Frame and John H. Frame was this memorandum, sent to a member of the firm by said county clerk: "The only lien on record against the above, so far as I have been able to find, is a judgment-lien against John H. Frame, in favor of Philip Frankenberger, for $143.90 with interest from the 13th day of June, 1885, and $1.90 costs. I find that John H. Frame is assessed on the personal property book of this county with the aggregate sum of $96.00, consisting of three head of cattle, at $40.00; two hogs, $4.00; one watch or clock, at $2.00; farming implements, $5.00; household, *etc.*, $45.00; I have given the boundary to each tract as it is in the deed above mentioned."

A member of one of the firms, Charles Loeb, went up to Braxton county to try and collect the amount due them for boots and shoes, which they had sold to John H. Frame, which amounted to $536.54. He said he could not pay it but was willing to secure them on his real estate, if they would give him six months' longer credit. To this Charles Loeb, one of the members of said firm, agreed; whereupon John H. Frame gave his note for the balance due the firm payable in six months and a deed of trust dated July 1, 1886, on an undivided moiety of five tracts of land, including the 100 acre tract claimed by the plaintiff. "When I made this arrangement for my firm, Jelenko & Loeb, I also, as the agent of the firm of Jelenko & Bro., wholesale dry goods merchants in Charleston, settled the balance due them from him to Jelenko & Bro., bought of them by John H. Frame. This balance was $482.54, for which he executed his note to Jelenko & Bro., dated July 1, 1886, payable in six months, which was secured by said deed of trust on said five tracts of land, including the 100 acre tract claimed by the plaintiff." This deed was executed and duly acknowledged by both John H. Frame and his wife, Amanda Frame and recorded in the office of the clerk county court of Braxton county, on July 2, 1886. The trustee in this deed of trust, George Goad, pursuant to the provisions therein, sold the said one undivided moiety of these five several tracts of land, and

Charles Loeb became the purchaser thereof for $700.00, which being paid in cash, said trustee executed and delivered to him a deed for one undivided moiety of these five tracts of land including this 100 acre tract claimed by the plaintiff. This deed is filed with the answer of the defendants, it having been recorded.

A lawyer on behalf of Lemuel M. Frame, when these lands were offered for sale, and before they were sold, publicly announced, that the party purchasing this 100 acre tract claimed by Lemuel M. Frame could not get any title thereto, as he had claimed the land for thirty years and lived upon it, and the trustee, Goad, said : "Certainly, you can only get such title as is in me."

*J. F. Brown* for appellants.

*W. E. R. Byrne* for appellee.

GREEN, JUDGE :

The first question presented by this record is : Will a court of equity specifically enforce in any case or against any one a verbal gift of land from a father to a child, as in some cases it is difficult, if not impossible, in principle to distinguish gifts and sales ? I will before considering directly this question state briefly the law in reference to the specific enforcement of verbal sales of land and the principles, on which it is based.

By the statute of frauds passed in 1677 and a similar statute to be found wherever the common-law prevails " No action shall be brought upon any contract or sale of land, tenements or hereditaments or interest in or concerning them, unless the agreement, upon which such action shall be brought, or some memorandum or note thereof shall be in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized." Code 1887, c. 98. The English courts very soon after the passage of their statute of frauds took the view, that, while the chancery courts were as much bound by this statute as the common-law courts, yet, as it was the peculiar province of a chancery court to relieve against fraud, a court of chancery despite this statute would specifically enforce a verbal

contract for the sale of land, when the refusal to execute the contract would itself amount to the practicing of fraud by the defendant on the plaintiff. In so doing, they said, they were engrafting no exception on this statute but simply proceeding to prevent fraud upon general principles, which prevailed universally in courts of equity; and it would never do to so construe the statute of frauds, as to promote instead of suppressing fraud, as it was intended to do. Browne, Stat. Frauds, § 457

If the defendant has partly performed his part of such contract, and his act of part-performance is incapable of compensation in damages, it would obviously be fraud on the plaintiff to permit the defendant to refuse to execute such contract, because it was verbal; and in such case a court of equity will compel the specific performance of such verbal contract. If, for example, the vendor of real estate by a verbal contract has delivered possession of the land to the vendee, this will entitle the vendee, who is in possession of the land, to compel a specific performance of the contract by making a deed therefor on the payment of the purchase-money; for otherwise the vendor might sue the vendee as a trespasser, and to permit him to do so, after he has put the vendee in possession under the verbal contract, would be to permit him to take advantage of his own wrong in repudiating his obligation, and it would be punishing the vendee, who has complied with his own obligation. If the vendee has taken possession of the land, the courts regard, that the wrong done by compelling him to surrender the possession of it as a trespasser is such an injury, as could not be compensated in damages, and hence there is no other way of punishing the recalcitrant vendor for committing a fraud on the vendee, who has complied with his contract, by treating him as a trespasser. The authorities supporting these views are numerous, both in England and America. See 2 Lomax, Dig. p. (40,) 55; 1 Story, Eq. Jur. § 761; Wat. Spec. Perf. § 270.

It is also settled both in England and America, that, if the vendee under a verbal agreement for the purchase of real estate expends labor or money in improving the same, the contract is thereby partly performed, and the statute of frauds

has no application to it. In such a case the improvements by the vendee in possession constitute valuable and equitable consideration and entitle him to specific execution of the contract, which he complies with fully on his part.

There is, then, *first*, the verbal agreement; *second*, the delivery and taking possession of the estate in accordance with the agreement; and, *third*, the expenditure of money in consequence and in faith of the agreement; and, *fourth*, a complete compliance with the agreement on the part of the vendee by the payment of the entire purchase-money. If the first of these circumstances alone exists, the statute of frauds denies all remedy. When the second ensues, the vendee has partly performed his contract and has taken a step, which would render it a fraud on the part of the vendor to devest him of his possession and refuse him a deed. When the third circumstance follows in expenditures to improve the land, all the powers of equity are summoned into action to protect the vendee on several grounds, each sufficient and each distinct in its nature. It will then, when the vendee fully complies with his contract, compel specific execution by the vendor, because—*first*, it would be a fraud in him to refuse it; *secondly*, he would profit by his own fraud in acquiring the improvements with the land he sold; and *thirdly*, the vendee has introduced a valuable consideration, which, if he should lose it, could not be restored to him and is not ordinarily of a nature to be compensated in damages. These views are well sustained by both English and American authorities. See 1 Sugd. Vend. (8th Amer. Ed.) p. (151,) 226; 1 Story, Eq. Jur. § 861; Browne, Stat. Frauds, § 487a; Wat. Spec. Perf. § 280; *Rhea* v. *Jordan*, 28 Gratt. 683; *Tracy* v. *Tracy*, 14 W. Va. 243.

If a donee being a child under a parol gift of real estate by a father take possession and expend money or labor to improve it, as against the donor he stands upon the same footing as a purchaser for a valuable consideration. The statute of frauds has no application to the transaction, and equity will compel its specific performance by requiring him to execute his deed to consummate his gift.

We will now consider parol gifts specially. If A. points to a house and lot and says to his child, B. : "I give you this

house and lot," and B. says; "I accept the gift," and nothing more passes in reference to the matter, a court of equity will take no cognizance of it. B., if he had paid A. for the house and lot without taking possession, could not compel him to execute a deed, because he could have his remedy in recovering the money, he had paid, with interest in a court of law. *A fortiori* a court of equity will not entertain B. when he has paid nothing; and, if B. should sue at law, he can recover nothing, because A's promise or gift was without consideration,—*a nudum pactum,*—and B. has suffered no damages. The donee has not changed his situation, and there is no basis for an appeal to a court of equity to interpose. But suppose B. enters the house and makes it his home and goes on to act as owner and improves the premises by the expenditure of money or labor. He digs ditches and enriches the land. He builds fences for its permanent protection. He sets out trees, clears the land and lives in the house. These acts change the situation and fix the gift. Why? Because valuable consideration has now entered into the transaction. The agreement of gift has been partly performed by acts which can not be undone. A valuable consideration may be a detriment to the promisee or a benefit to the promisor. What was in its inception-promise sustained only by a good consideration—the love and affection of a father to a child—has by such acts become in effect a promise sustained by a valuable consideration.

It may be regarded as settled law in this state and in Virginia, that a verbal donee of land, a child, who under the verbal gift has taken possession of the land and improved it, has a right to demand in a court of equity a specific performance of the contract by the execution of a deed by the father, thereby consummating his verbal gift. This was so held in *Shobe's Ex'rs* v. *Carr*, 3 Munf. 10, decided as long ago as 1811, and this case has been repeatedly followed or recognized as law by numerous Virginia decisions ever since. See *Darlington* v. *McCoole*, 1 Leigh, 36; *Reed's Heirs* v. *Vannorsdale*, 2 Leigh, 569; *Pigg* v. *Corder*, 12 Leigh, 69; *Cox* v. *Cox*, 26 Gratt. 305. There are also numerous authorities in other states to the like effect. *Freeman* v. *Freeman*, 43 N. Y. 34; *Lobdell* v. *Lobdell*, 33 How. Pr. 347; *Shepherd* v.

*Bevin,* 9 Gill, 32; *Young* v. *Glendenning,* 6 Watts, 510; *Galbraith* v. *Galbraith,* 5 Kan. 409; *Kurtz* v. *Hibner,* 55 Ill. 521; *McLain* v. *School-Directors,* 51 Pa. St. 196; *Neale* v. *Neales,* 9 Wall. 1; *Hardesty* v. *Richardson,* 44 Md. 617.

If however a father give his child verbally a farm and put him in possession thereof, but the child neither spends money nor labor in improving the land, it is very questionable in Virginia and in West Virginia, whether the child in a court of equity can compel the father to make him a deed. It was so decided in the cases of *Stokes* v. *Oliver,* 76 Va. 72, and *Keffer* v. *Grayson,* Id. 517. In these cases it was held, that the love and affection of a father to a child is not enough of itself to warrant a decree for a specific performance, even when the agreement to make the gift is in writing, and the child is in possession of the farm. But the contrary was held by this Court in *Marling* v. *Marling,* 9 W. Va. 79. But, in delivering the opinion of the court in that case on page 95 I express my own opinion, that, while such agreement need not be under seal, it must be a formal agreement in writing duly delivered as such, and while in such case, the consideration being good though not valuable, a court of equity can properly dispense with the seal to it, yet it can not dispense with its being a formal agreement in writing; and a verbal agreement to give a farm to a child can not be enforced specifically, even when the child has been put in possession of the farm. Such agreements of gift, when performed in part by putting the donee in possession, have been enforced in some states. See TILGHMAN, C. J., in *Lessee of Syler* v. *Eckhart,* 1 Bin. 380; *Big Fraud,* 386; Smith, Eq. 254, 255; *Mahon* v. *Baker,* 26 Pa. St. 519. And it must be admitted that the reasoning, which supports the enforcement of a verbal contract of sale partly performed by the simple delivery of possession, appears equally applicable, when there is a verbal gift of land by a father to a child accompanied by the delivery of the possession of the land. See 1 Story, Eq. Jur. § 761, and articles of John W. Daniel in the April, 1883, number of Virginia Law Journal, where the question we are considering is elaborately discussed in an able article. Many of the views taken in said article I have adopted in this opinion.

I have thus far been discussing the right of a donee or vendee of real estate by a verbal agreement to enforce specifically such verbal agreement, when the donor has put the donee in possession of the land. We will now consider, whether the law is modified, when the vendee or donee in possession of the land seeks to have his contract specifically enforced against a subsequent purchaser for valuable consideration of the donor, or against a judgment-creditor of the vendor or donor.

In the first place it must be observed, that, when the vendee or donee is in possession of the land openly and notoriously living upon it, for instance, there can not be a purchaser of the land for valuable consideration without notice from the vendor or donor, because such possession by the vendee or donee of itself conveys notice to the whole world of the equitable title of the vendee or donee and of his right to the legal title, the possession of realty being the fact of most comprehensive and far-reaching consequences, that bears upon its title. The perfect legal title was originally conferred by this delivery of possession or livery of seisin. A fee was not perfect without this delivery of possession, but, if accompanied by such delivery of possession, it was perfect, even though it was a mere verbal transfer. The earth has been described as that universal manuscript, open to the eyes of all. When therefore a man proposes to buy or deal with realty, his first duty is to read this public manuscript, that is, to look and see, who is there upon it, and what are his rights there. And, if the person in possession has an equitable title to it, he is as much bound to respect it, as if it was a perfect legal title evidenced by a deed duly recorded. See 2 Sugd. Vend. 866; Sedg. & W. Tr. Title Land, § 717; 1 Story, Eq. Jur. § 400; Big. Fraud, 293, 294; *Floyd* v. *Harding*, 28 Gratt. 410; *Merithrew* v. *Andrews*, 44 Barb. 207; *Grimstone* v. *Carter*, 3 Paige, 421; *Hadduck* v. *Wilmarth*, 5 N. H. 181; *Knox* v. *Thompson*, 1 Litt. (Ky.) 350; *Tuttle* v. *Jackson*, 6 Wend. 213; *Parks* v. *Jackson*, 11 Wend. 442; *Morgan* v. *Morgan*, 3 Stew. (Ala.) 383.

When the sale or gift of the land is by a verbal agreement, the terms of such agreement must be definite and made out with reasonable certainty. See *Wright* v. *Pucket*, 22 Gratt.

370. By reasonable certainty.is not meant a mathematical certainty; but what is meant is, that the evidence adduced must leave the court satisfied and convinced as to the terms of the agreement, and it must be so definite as to guide the court safely into carrying it into execution.

The plaintiff, who seeks a specific performance of a verbal contract or gift of land, or indeed who seeks the aid of a court of equity to enforce any equitable right, must show, that he has used reasonable diligence, and that his claim is not a stale claim. See 1 Bart. Ch'y Pr. § 23. As there stated, it is a familiar doctrine of the courts of equity, that nothing can call them into activity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing.

We will assume, first, that a verbal gift of this 100 acres of land patented to William B. Frame September 30, 1846, was by him about May 12, 1856, made to his son, Lemuel M. Frame, and that the donee then took possession of the land exercising an undisputed ownership over it from that time, selling timber grown on it to his father and others, and had lived upon it and cleared it and cultivated it ever since, and that considerable time and money had been spent by him in improving it. These facts the counsel of the plaintiff, L. M. Frame, regards as clearly proven. If they are really proven with the requisite degree of distinctness and certainty, then on the authorities, we have cited, it would seem clear, that the son of L. M. Frame had a right to specifically enforce this agreement against his father, William B. Frame, provided he used reasonable diligence in instituting his suit and did not permit his claim to become too stale, before he brought his suit.

It is claimed by the plaintiff, L. M. Frame, that he was in the exclusive and uninterrupted possesion of this farm claiming against all the world and especially against his father, the donor,—actually selling him timber grown thereon. It was unnecessary for him to institute this suit, while this state of things existed. The donee, L. M. Frame, was not called upon to act, no one disputing his right to the same, and he having held possession and use of it. There is much strength in this view; and so long as this state of things existed, the

court might be disposed to excuse the plaintiff for not insti-
tuting this suit for a specific performance. How long did
this state of things exist ? The record shows, until May 26,
1868, but not thereafter; for William B. Frame, the father,
exercised the most decisive act of ownership over this 100
acre tract; as on that day for a consideration stated on the
face of the deed to have been $500.00 he and his wife con-
veyed to their sons Thomas J. and John W. Frame seven
different tracts of land including the tract of 100 acres
claimed to have been given verbally to said L. M. Frame
thirteen years before. This put it entirely out of his power
to make a deed of this land to L. M. Frame. Knowing that
he could not acquire a valid title for this tract of land, on
which he was living, except by instituting in a court of equity
a suit for the specific performance of the verbal agreement to
give it to him, made by his father some thirteen years before,
he never could have acquired a good title to it by living upon
it, claiming it as his own, and exercising rights of ownership
over it, no matter how notorious, undisputed and exclusive
such possession was; for, as he entered upon the land by
permission of his father, who had legal title, his possession
was admitted in subordination to his father's title, and was
not therefore and could not become adversary to his father's
title or the title of those claiming by deed under his father.
See *Hudson* v. *Putney,* 14 W. Va. 561. He knew therefore
as early as June, 1868, that, if he wanted a title to this 100
acre tract, on which he lived, he would have to get it by
asking a court of equity to compel the legal owners to convey
the land to him, as the true equitable owner. It was his duty
therefore, if he did not mean to abandon his equitable title, to
institute this suit in a reasonable time after January 1, 1868.

It may be said, that he did not know, that his father then
conveyed this tract of land to his two brothers. But though,
perhaps, we can not assume, that he knew this deed was made
to his brothers by his father, simply because it was promptly
put on record, yet there is his own statement in his deposi-
tion of facts, which shows, that he did know of the making
of this deed to his brothers; for he says he always paid the
taxes on this land, though it was taxed in his father's name

until 1868, and then in the name of his brothers; that the tax-bill was thus made out, and he paid the taxes on this tract, though the tax-bills were made out against his brothers, and that he refused to pay them after a while, if not differently made out. He was thus reminded each year by these tax-bills, that the legal title of this land was in his father till 1868 and after that in his brothers. It was clearly his duty, when it was thus made known to him, that he could not acquire legal title to this land except by suit, to bring such suit with reasonable promptness, especially as thirteen years had already expired, since he claimed the equitable right to this land. But he did not institute such suit for more than nineteen years, some thirty two years after the alleged verbal promise of his father to give him this land. In the mean time his father had died and one of his brothers, to whom in 1868 his father had conveyed this land. And the records of the clerk of the County Court showed, that upon the fact, that he owned this land, this brother had acquired a credit and had been trusted, and on his giving security to pay his debts so owed in the shape of a deed of trust on his interest in this and other lands the trustee had sold said interest in said land at public auction for cash.

There is a strong contrast between the care and diligence of the plaintiff in protecting his rights and that of the defendants. Before they extended credit to the plaintiff's brother, and took this deed of trust of him, they had the clerk's records in the County Court of Braxton, where his brother lived, examined to ascertain what lands he owned, and what liens were upon them; and all they now ask is, that as they have used every precaution in conducting their business, the court will not deprive them of the security they took by setting up an equitable title of the plaintiff, of which they had no actual notice and of which the plaintiff must have in the nature of things known, that they could take no notice. They were wholesale merchants living remote from Braxton county in Charleston. The defendant John H. Frame was engaged in mercantile business in the county of Braxton, and his brother, (the plaintiff) who lived near him, must have known, that in conducting such business he would buy his goods of wholesale merchants at a distance

and thus incur debts, and such creditors would have no means of knowing his pecuniary condition, except as it was shown by the records in the office of the clerk of the County Court. So by his neglect in bringing the suit, the plaintiff must have known he was furnishing his brother John H. Frame the means of imposing on the wholesale merchants, of whom he was buying his goods on credit, as to his pecuniary condition. Just what might have been expected, did occur, and loss must now be sustained. Should this loss be sustained by the plaintiff, who was so grossly careless, or by the defendants, who acted with caution and diligence? *Vigilantibus non dormientibus jura subveniunt.*

But the staleness of the plaintiff's claim is not the only difficulty in making out his case, as presented by the record. I have heretofore assumed, that he proved the verbal gift of this 100 acres of land from his father in 1856. But has he proven the agreement to make this gift with the requisite degree of certainty and distinctness, such as a court of equity should require, especially when it is borne in mind that the plaintiff, who alleges this verbal agreement, asks to have it specifically enforced to the obvious loss of purchasers from his brother for valuable consideration without any actual notice of such verbal gift? The bill alleges, that the plaintiff lived with his father and worked and assisted him on his farm until his marriage, which occurred on May 1, 1855; that his father at that was the owner of seven or eight different tracts of land in Braxton county, W. Va., and being desirous of compensating the plaintiff for his services and starting him in life, proposed to him, that, if he would go upon a certain tract of land, situated on the south side of Elk river, about one mile above Frame's mill in said county, containing 100 acres, and cultivate and improve the same, he would give said land to him and make him deed therefor; that the plaintiff accepted this preposition and on or about May 12, 1855, moved upon said land, and has since held and claimed the same adversely to all the world, that this possession has been open, notorious, and exclusive from that day to this,—a period of over thirty two years; that "some years after the plaintiff moved on this land,—in the month of May, 1868,—being apprehensive,

that he might be made liable by reason of his suretyship of a constable named Wilson because of a fault he determined to convey all of his said land to his two sons, the defendants Thomas J. and John H. Frame. He made them a deed, duly recorded, a copy of which is filed with the bill. On the face of the deed the consideration purports to be $500.00 cash. This verbal agreement by the plaintiff's father to give him this tract of land was not an absolute promise to give him the land, and make him a deed therefor but was only a conditional promise, that he would do so, if the plaintiff (his son) would cultivate and improve the same. In what way he was required to improve the same is not stated in the bill, if it was specified by the father at the time. But, as the bill states that "the plaintiff (the son) accepted the proposition, moved upon the land, erected a house thereon, and commenced to cultivate and improve the same," it is very probable, that the building of a dwelling-house on this farm, as a residence for his son and his family, he having married, was an improvement required of the son by the father. This is the more probable as we may infer from the proof in the case, that the house then on the land was a very indifferent one, in fact, one not fit to be occupied by his son's family as their dwelling. But even this very indifferent house was then occupied by a woman, who might not surrender the possession of it. There is no direct proof as to the character of this house, that was on the land, but the plaintiff's son proves, that about a year before this suit was brought his father (the plaintiff) offered to sell to T. A. Reip the house and garden at $50.00, and his brother John said his father should have taken less than he asked for it. We may, I I think, fairly infer from this, that the house was hardly fit for a man and his family to occupy. The plaintiff testified that he built a house on this land. But I assume it was a very poor house, as he continued to live in a house worth less than $50.00. When he built this house does not appear. It only appears, that the son (the plaintiff) moved into the house on the place, when the gift was made by the father. This, the proof shows, was not at the time he was married, on May 1, 1855. There is nothing said about his marriage in the evidence. If the agreement was, that the father would

make the deed to the plaintiff the son, if he would build a residence on the farm and improve it, as the bill says, such an agreement was a conditional agreement.

The building of the residence and improving the farm being a condition precedent to the son's acquiring a right to demand a deed of the father, and if a time was named when the house was to be built, if the son failed to build the house in the specified time or of the character named, he lost forever a right to demand a deed of the father. *Keffer v. Grayson,* 76 Va. 517. Some twelve years after this parol agreement to make a gift on certain conditions to his son (the plaintiff,) the father actually conveyed this land to two sons. "Why he did so," the bill says, "the plaintiff is not advised. Certain it is that it was never intended by his father or his brothers to deprive him of the ownership or possession of this tract of land." It seems to me, a probable explanation of the conduct of the father and brothers to the plaintiff is, that, he having failed to comply with the condition on which only the father was to convey to him the land, that is, as I surmise, to build in a certain specified time a house of a particular character, he had no right to demand a deed of his father, and his father was at liberty to convey it to his other sons; and this he did because of the failure of the plaintiff to comply with the condition imposed on him by his father, the plaintiff and his family after twelve years still living in a house worth less than $50.00.

The answer of the defendants to the appellee's bill denied this verbal gift by the father to his son (the plaintiff) of this land. This put on him the burden of proving this parol agreement of his father to give him this land; and the law, we have seen, required him to prove the agreement with definiteness and accuracy. Has this been done? It seems to me, it has not. No one, who was present, when the alleged verbal agreement was entered into by the father and son, testifies in the case to what then transpired, or as to the terms of or conditions attached to the gift. That it was a conditional agreement we learn only from the allegations in the bill. There is not one particle of evidence showing what the terms or conditions of the gift were. The whole proof consists of subsequent admission by the father, that

he had given this land to his son (the plaintiff) or admission by conduct or by acts that he regarded this farm as belonging to his son (the plaintiff.) But such statements and conduct are what would naturally have occurred, had the verbal gift of this farm to his son (the plaintiff) been a conditional one, such as is set out in the bill, or such as I have above suggested. Naturally, the father would have expected the condition precedent attached to the gift would in good time be complied with by the son, and the gift thus perfected; and anticipating that this would be the case the father would naturally speak and act as if this farm belonged to his son, though he had no right to demand a deed for this farm, unless he complied strictly with the conditions precedent to the gift, whatever they were.

The most direct and satisfactory evidence of this verbal agreement was the deposition of a nephew of the father, giving what was said casually by the father to the witness the day after this verbal gift of this farm to his son, (the plaintiff.) This we will analayze. He says in his deposition taken October 17, 1887: " L. M. Frame, the plaintiff, has resided on this farm of 100 acres about thirty one years. I went to his father's, William B. Frame's, one morning, and he said to me: 'I have made way with my land.' I said, 'Have you ?' and he said, ' Yes. I gave Lemuel a farm yesterday,'—and he pointed to the 100 acre farm across the river as the one he had given him. He said he let John and Tom have the balance. He had owned six or seven tracts of land. He said: ' Now Lemuel can go to work, or starve.' He said too, they would have to give Nancy Jones, to get her out of the house, two bushels of corn, before Lem could move in."

Though this witness is so definite as to what was said then, still it is obvious, that his testimony is far from being satisfactory. It gives the details of a casual conversation, in which the witness had no interest, and which occurred some thirty one years before. We know there must have been very substantial errors in it. For instance, the bill does not pretend, that William B. Frame gave all his land to his three sons at that time, in 1856 ; but it says he gave this one farm of 100 acres to his son (the plaintiff) then and the bal-

ance of his land to his two other sons, John and Thomas, some twelve years afterwards; and not one member of the family or a single other witness ever heard of any gift at that time of any of his lands by William B. Frame to any of his children except this 100 acres to his son, the plaintiff. This, I suppose, was a mistake made by the nephew as to what his uncle, William B. Frame, then said to him. He heard this many years afterwards. This witness said, that the father said, "Now Lemuel," (the plaintiff,) "must go to work." This does not look as if the gift was made, as stated in the bill, "to compensate the plaintiff for his past services and to start him in life." He had lived with his father, but we may infer from what his father said, that he did not think his past services deserved compensation, but rather considered, that he had heretofore supported him in idleness, and he proposed to do so no longer, but he must "go to work or starve."

There is in this conversation corroborative evidence of the small value of the house on this 100 acres of land; for it is supposed, Nancy Jones would let the son move into this house, and she would give it up for the trifling compensation of two bushels of corn. She could not have regarded the house at all desirable to live in, if she could surrender it so easily.

This conversation took place before the son (the plaintiff) had taken possession of this farm, and when of course the conditional gift named in the bill was imperfect, and when of course the son had no right to demand a deed of the father; and, though the statements and acts of the father subsequently show simply, that he had given his son (the plaintiff) this farm, and were made, after he had taken possession, yet none of them are inconsistent with the gift being conditional and the condition not complied with; and this, one suspects, was the case, from the fact that the father some twelve years afterwards made to two other sons a deed for this farm. It seems to me, therefore, that the plaintiff has failed to show with the requisite degree of distinctness and accuracy the terms of the verbal agreement made by his father giving him this land because of the great lapse of time (thirty one years) before the institution of this suit.

The court below ought to have dismissed the plaintiff's bill at his costs. The court below obviously by its order made December 5, 1887, properly dismissed the bill as to the defendant, Thomas J. Frame, he tendering with his answer a deed to the plaintiff for his moiety of the land, which the plaintiff was willing to accept; but the court below erred in its decree of May 2, 1888, specifically enforcing said alleged verbal contract against the other defendants.

This decree must be set aside, annulled and reversed, and the appellants must recover of the appellee, L. M. Frame, their costs in this Court expended; and this Court entering such order, as the court below should have entered, must dismiss the bill of the plaintiff; and the defendants below other than Thomas J. Frame must recover of the plaintiff below their costs expended in the court below.

REVERSED.